**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **8:25-cr-335 (FWV)** |
| **MARQUIS COPEZ** | **:** | |

# DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF GOVERNMENT'S PROFFERED HANDWRITING EXPERT AND REQUEST FOR *DAUBERT* HEARING

The Court should not let a handwriting examiner testify based on unexplained hunch. But this is precisely the kind of testimony the government has proffered. The examiner can tell us *what* she reviewed to reach her conclusion – she compared over 75 pages of documents and noticed marginal flourishes in which some were significant, others were not, and of the significant flourishes, some were distinct and some were different. But the examiner has not provided evidence as to *why* she reached her conclusion. How did she detect whether a marking was significant? How many similarities were sufficient to conclude there was a match? How did she weigh similarities against differences in her conclusion? How did she know if different markings were the result of different authors or merely due to natural variances is one's own penmanship? The government has provided no studies, no articles, and no publications answering any of these questions, let alone demonstrating that the examiner's "methodology" is testable, reliable, peer reviewed, or accepted by a scientific industry.

Mr. Copez asks the Court to exclude the examiner's testimony in its entirety. Alternatively, should the Court permit her to testify, Mr. Copez proposes that she not be permitted to testify to her conclusions regarding authorship or the degree to which she believes confidence or certainty upon which her opinions are based.

## STATEMENT OF FACTS

A grand jury returned an eight-count indictment against Mr. Copez and trial has been set for August 3, 2026. At issue are four handwritten letters ("the Letters") signed by four different people. The government alleges that it was Mr. Copez who authored each of the Letters, not the Letters' signatories. In preparation for trial, the government has hired an examiner, Ms. Mary O'Brien, and proffered her as an expert witness in the field of forensic handwriting analysis.

The examiner looked at the Letters and compared the handwriting to known writing samples from the four signatories. Pointing to factors such as whether "G" appeared to be written with one stroke or two strokes and whether the bowl shape in "D" was, on one hand, "rounded" or, on the other hand, more like a "pregnant belly," the examiner concluded that Mr. Copez "probably wrote" the questioned letters and that the other three signatories (Mr. Gemmill, Mr. Halloway, and Mr. Moulden) "probably did not" author the questioned letters. *See* Ex. 3, Expert Disclosure, Exhibit C at 9–11.[1]

## ARGUMENT

Mr. Copez asks the Court to preclude Ms. O'Brien's testimony in its entirety because the government cannot satisfy *Daubert* and Federal Rule of Evidence 702. *See Daubert v. Merrell Down Pharmaceuticals, Inc.* 509 U.S. 579 (1993). Handwriting examination is an unscientific undertaking which fails each of the five factors *Daubert* directs courts to consider. Indeed, examination of handprinted text (as is the case here), is even more suspect. And Circuit authority permitting the admission of handwriting analysis is outdated and distinguishable.

In addition, Ms. O'Brien simply did not apply the methodology underlying handwriting analysis—such that it is—correctly or reliably. She analyzed less than half of the characteristics

[1] Citation is to the page numbers listed on the document, not the page numbers of the PDF.

she was instructed to examine, failed to complete a direct comparison, comparing, instead, apples to oranges, omitted any explanation as to how she reached her conclusion, and failed to submit her analysis to verification.

Alternatively, should the Court permit Ms. O'Brien to testify, Mr. Copez requests that she only be permitted to testify that she examined the letters and writing samples and found some similarities and some differences. Ms. O'Brien should not be permitted to testify as to her conclusions regarding authorship or the degree to which she believes confidence or certainty upon which her opinions are based.

## I. Legal Standard

To be admissible under Federal Rules of Evidence 702, the proponent of expert testimony must establish that 1) "the testimony is the product of reliable principles and methods" and 2) "the expert's opinion reflects the reliable application of the principles and methods to the facts of the case," among other things. Fed. R. of Evid. 702. In *Daubert*, the Supreme Court charged federal trial judges with a critical "gatekeeping" role of ensuring that any and all expert testimony admitted rests on a reliable foundation. 509 U.S. at 589 ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence is not only relevant, but reliable"). *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999) (extending *Daubert's* holding on scientific expert testimony to all expert testimony); *Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017) ("Rule 702 imposes a special gatekeeping obligation on the trial judge to ensure that an opinion offered by an expert is reliable"); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282-84 (4th Cir. 2021) ("[R]eliability and relevancy . . . are preconditions to the admissibility of expert testimony."). Though district courts have broad discretion in analyzing the reliability of expert testimony, "such discretion does not include the decision to abandon the gatekeeping function." *Sardis*, 10 F.4th at 282 (quoting *Nease*, 848 F.3d at 231) (internal quotations omitted).

This requirement recognizes the powerful and potentially misleading quality of expert testimony. *See Daubert*, 509 U.S. at 595. *See also Cooper v. Smith & Nephew, Inc*. 259 F.3d 194, 199 (4th Cir. 2001).

Under *Daubert*, the court balances five factors in assessing the admissibility of expert scientific testimony: 1) whether the scientific theory has been tested; 2) whether the theory is subject to peer review and publication; 3) the known or potential rate of error; 4) the existence and maintenance of standards controlling the technique's operation; and 5) general acceptance within the relevant scientific community. *See Daubert*, 509 U.S. at 593-94. This list is not exhaustive, and the court can consider any factor that bears on reliability. *See Sardis*, 10 F.4th at 281. "Importantly, 'the inquiry to be undertaken by the district court is a flexible one focusing on the principles and methodology employed by the expert, not on the conclusions reached.'" *Jones v. Allen*, No. PX-15-1173, 2016 WL 9443772, at *2-3 (D. Md. Oct. 24, 2016) (quoting *Wasterberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)) (quotations omitted).

## II. Ms. O'Brien's proposed testimony is not a product of reliable principles and methods

### a. Criticism of handwriting analysis—particularly in the last two decades—is extensive and supports excluding the expert's analysis here

> Handwriting analysis has never been subject to meaningful reliability or validity testing, comparing the results of the handwriting examiners' conclusions with actual outcomes. … There is no peer review by a 'competitive, unbiased community of practitioners and academics.' … To the extent that handwriting analysis techniques have been 'generally accepted' by a relevant technical community, that community has not been a 'financially disinterested independent community, like an academic community.' The results of expert handwriting analysis have never been proven more reliable on the issue than the opinions of lay people.

*United States v. Oskowitz*, 294 F.Supp.2d 379 (E.D.N.Y. 2003) (citation omitted); *see also*, *United States v. Hines*, 55 F.Supp.2d 62, 68 (D.Mass.1999) (noting that a rigorous application of the

*Daubert* standards to handwriting evidence would reveal "serious problems"); *Gantt v. Roe*, 389 F.3d 908, 915 n. 9 (9th Cir. 2004) ("We note that handwriting analysis is, even in the best of circumstances, not an exact science. A highly respected district judge has concluded that such evidence must be used with caution because it has 'serious problems' under the *Daubert* and *Kumho Tire* standard for scientific reliability.") (citing *United States v. Hines*, 55 F.Supp.2d 62, 68 (D.Mass.1999)); *United States v. Foust*, 989 F.3d 842, 847 (10th Cir. 2021) ("We recognize that there has been criticism of handwriting expertise in both the courts and academic literature."); *United States v. Johnsted*, 30 F.Supp.3d 814, 818 (W.D. Wis. 2013) ("With its underlying principles at best half-tested, handwriting analysis itself would appear to rest on a shaky foundation."); *United States v. Starzecpyzel*, 880 F.Supp. 1027, 1028 (S.D.N.Y. 1995) (explaining that if *Daubert* did apply, it "might well have concluded that forensic document examination constitutes precisely the sort of junk science that *Daubert* addressed.").

Handwriting analysis rests on three very basic premises: 1) uniqueness (i.e., each individual has unique handwriting); 2) intra-person variability (i.e., each individual has variation within their own handwriting); and 3) reliable comparisons can determine authorship. Courts and the broader legal community, however, have found these principles to lack empirical support, and the government's disclosures here have done nothing to ameliorate those concerns.

As to uniqueness, in *United States v. Hidalgo*, 229 F.Supp.2d 961, 967 (D. Ariz. 2002), the district court acknowledged that although the principle of uniqueness may be generally accepted within the handwriting examiner field, "there is no evidence before me to support the thesis that handwriting is unique." *Hidalgo*, 229 F.Supp.2d at 967. It therefore found "that the principle of uniqueness of handwriting … fails to satisfy a *Daubert/Kumho* analysis." *Id.* Here too, the

government has offered no evidence (e.g., peer-reviewed analysis, studies demonstrating error rate, scientific testing) establishing this first fundamental premise—that handwriting is unique.

Second, in *United States v. Johnsted*, 30 F.Supp.3d 814 (W.D. Wis. 2013), a district court considered the second fundamental principle, noting that the "government does not dispute the troubling lack of evidence testing or supporting the second fundamental premise of handwriting analysis," intrapersonal variance. *Id.* at 818. The court consequently excluded the examiner's testimony, concluding:

> This lack of testing has serious repercussions on a practical level: because the entire premise of interpersonal individuality and intrapersonal variations of handwriting remains untested … the task of distinguishing a minor intrapersonal variation from a significant interpersonal difference—which is necessary for making an identification or exclusion—cannot be said to rest on scientifically valid principles. The lack of testing also calls into question the reliability of analysts' highly discretionary decisions as to whether some aspect of a questioned writing constitutes a difference or merely a variation; without any proof indicating that the distinction between the two is valid, those decisions do not appear based on a reliable methodology.

*Id.* Similarly, here, the government has offered no evidence of any studies demonstrating that the examiner's discretionary judgments about when a questioned writing reflects a genuine inter-person difference or a mere intra-person variation are testable or reliable. Nor has the government attempted to illustrate any reliable evidence of error rate.

Finally, the court in *Almeciga v. Center for Investigative Reporting*, 185 F.Supp.3d 401 (S.D.N.Y. 2016), critiqued the third premise: reliable comparisons can determine authorship. "[N]o studies have evaluated the reliability or relevance of the specific techniques, methods, and markers used by forensic document examiners to determine authorship." *Id.* at 419. The court elaborated:

> [T]here are no studies, to this Court's knowledge, that have evaluated the extent to which the angle at which one writes or the curvature of one's loops distinguish one person's handwriting from the next. Precisely what degree of variation falls within

> or outside an expected range of natural variation in one's handwriting—such that an examiner could distinguish in an objective way between variations that indicate different authorship and variations that do not—appears to be completely unknown and untested. Ditto the extent to which such a range is affected by the use of different writing instruments or the intentional disguise of one's natural hand or the passage of time. … Until the forensic document examination community refines its methodology, it is virtually untestable, rendering it an unscientific endeavor.

*Id.* at 419–20.

Indeed, critiques of handwriting analysis have only increased over time. For example, in 2009, the National Research Council published a report concluding that the "scientific basis for handwriting comparisons needs to be strengthened." Comm. on Identifying the Needs of the Forensic Sciences Cmty., Nat'l Research Council, *Strengthening Forensic Science in the United States: A Path Forward* 166 (2009). Similarly, in 2016, the President's Council of Advisors on Science and Technology expressed concerns regarding the validity and reliability of conclusions made by forensic examiners, including handwriting analysts. Executive Office of the President, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* 1 (2016).

As Judge Rakoff explained in *Almeciga*, as to the first *Daubert* factor, "no studies have evaluated the reliability or relevance of the specific techniques, methods, and markers used by forensic document examiners to determine authorship (as opposed to their overall ability to 'get it right.'[)]" 185 F. Supp. 3d at 419. As to the second facot, "to the extent the field [of handwriting examination] has been subject to any 'peer' review and publication, the review has not been sufficiently robust or objective to lend credence to the proposition that handwriting comparison is a scientific discipline." *Id.* at 421. As to the third factor, "[t]here is little known about the error rates of forensic document examiners." *Id.* As to the fourth factor, "the field of handwriting comparison appears to be "entirely lacking in controlling standards." *Id.* at 422. And as to the

final factor, general acceptance in the expert community, "handwriting experts 'certainly find 'general acceptance' within their own community, but this community is devoid of financially disinterested parties'" and therefore, "[s]uch acceptance cannot be taken for much." *Id.* at 423. Here, the government's disclosures have failed to address these concerns, let alone alleviate them.

**b. Handwriting analysis of print writing is particularly suspect**

To make matters worse, not all types of handwriting are created equal. Printing, in particular, is easier to fake than cursive because words are drawn one individual letter at a time. Forging cursive writing, by contrast, is more complicated, because cursive is done in a single, connected and fluid motion. Here, the Letters were all written in print. Therefore, the Court needs to consider the reliability of print handwriting comparison in particular.

Most data on document examiner dependability in identifying the author of handwriting has dealt with cursive and not printed writing. *4 Modern Scientific Evidence* at 500 (2013-2014 edition).; *See also Fujii*, 152 F. Supp. 2d at 941. And what studies there are rase substantial concerns. For example, a proficiency test involving handprinting was performed in 1986, and revealed a 45% error rate on that test. *4 Modern Scientific Evidence* at 500. In the 1986 Forensic Sciences Foundation proficiency test:

> Participating labs were told to assume that police had stopped a car with three known occupants. In the car they found a hand-printed holdup note and other evidence linking the note to a holdup apparently committed by only one person. The labs were given a copy of the holdup note. They were also given a copy of handwriting exemplars from the three occupants of the car. Suspect 1 had actually printed the holdup note. Suspect 2 had not, Suspect 3 had not printed the holdup note either, but he was a document examiner whose hand printed exemplar was an attempt to simulate the printing on the holdup note. Forty-eight labs requested materials and 31 returned reports. Of those: 4 (13%) gave correct answers; 3 (9%) said that none of the authors of the exemplars had written the hold-up note; 10 (32%) were unable to reach any conclusions; 14 (45%) assigned authorship to the forger.

*4 Modern Scientific Evidence* at 612. The government's expert disclosures identify no contrary peer reviewed studies—indeed they identify no studies at all.

Case law supports the exclusion of expert testimony on handprinting. In *Johnsted*, the court was presented with a motion to exclude the testimony of the government's handwriting analyst. The *Johnsted* court held that, "[g]iven that the written communications at issue in this case are exclusively printing, and limited printing at that, this court is obligated to consider that specific discipline." *Johnsted*, 30 F. Supp. 3d at 818.

The court then excluded the report and testimony of the handwriting analyst. *Id.* at 822. The court reasoned that the government had failed to provide sufficient evidence demonstrating reliability of handwriting analysis to the handprinting at issue in the case. *Id.* The court found troubling the lack of a distinction in the standards for analysis of handwriting and handprinting, despite the apparent difference that exists between the two. *Id.* at 818-819. The court also noted that the standards at issue were discretionary, and that there was a relative dearth of studies addressing handprinting. *Id.* at 819-820.

The district court in *United States v. Fujii*, 152 F. Supp. 2d 939, 941 (N.D. Ill. 2000), also found troubling the application of handwriting analysis to handprinting. The court noted that there was no evidence that there was even a recognized field of expertise in identification of handprinting. *Fujii*, 152 F. Supp. 2d at 941. The court stated that, despite the proposed expert's stated qualifications and testimony that many of the documents she reviewed in her line of work were handprinted, "the court has no idea whether there is a recognized and accepted expertise in identifying handprinted documents, let alone whether [the proposed expert] is an expert in this putative field." *Id.* The court excluded the proposed handwriting expert's testimony in its entirety. *Id.* at 942.

The evaluation of the *Daubert* factors in *Johnsted* and *Fujii* apply with equal force to the case at bar. Ms. O'Brien's report makes no mention of any experimental, statistical, or scientific data demonstrating the reliability of handprinting analysis. Therefore, Ms. O'Brien's report and testimony should be excluded in its entirety.

**c. Existing Fourth Circuit case law does not control the outcome here and should be distinguished**

In the past, the Fourth Circuit has refused to reverse district court decisions that admitted testimony by government handwriting experts. *United States v. Crisp*, 324 F.3d 261 (4th Cir. 2003); *United States v. Smith*, 153 Fed.Appx. 187, 190 (4th Cir. 2005). But those cases do not control.

Those cases, decided under an abuse of discretion standard, do not hold that the district court must always admit expert testimony on handwriting analysis under Rule 702. Furthermore, they are over two decades old, barely rely on any case law, and never had occasion to consider the growing consensus over the last twenty years that handwriting expertise is unscientific and therefore of insufficient reliability. Equally critical, they never considered the difference between handwriting and handprinting discussed in *Johnsted* and *Fujii*. In addition, the defendants in *Crisp* and *Smith* did not present any evidence that handwriting analysis was unreliable—unlike here, where defense counsel has explained at length the flaws in the evidence supporting handwriting analysis and handprinting in particular. *Cf. Crisp,* 324 F.3d at 270–71; *United States v. Smith*, 153 Fed. Appx. 187, 190 (4th Cir. 2005).

Relying on *Crisp* and *Smith* without scrutiny perpetuates a vicious cycle of obfuscating a robust *Daubert* analysis. The court in *Almeciga* highlighted this flawed reasoning. *Almeciga v. Center for Investigative Reporting, Inc.*, 185 F.Supp.3d 401 (S.D.N.Y. 2016). Quoting former federal district judge and current Harvard Law Professor Nancy Gertner, the court stated:

> "[A] busy trial judge can rely on the decades of case law to legitimize decisions rejecting a hearing or motions in limine. And the trial judge can count on the Court of Appeals likely concluding that rejecting the challenge was not an abuse of the judge's discretion." … For decades, the forensic document examiner community has essentially said to courts, 'Trust us.' And many courts have. But that does not make what the examiners do science.

*Id.* at 418 n. 9, 423. This Court should follow this lead and exclude the expert testimony.

**III. Ms. O'Brien's proposed testimony does not reflect a reliable application of the principles and methods of legitimate handwriting analysis to the facts of the case**

Even assuming that handwriting analysis is a reliable methodology and passes through Daubert's first prong, Ms. O'Brien did not reliably apply it here. Courts have held that when examiners deviate from accepted methodology, they must provide evidence demonstrating that their specific methodology is testable and reliable. *See Crew Tile Distribution*, 763 Fed App'x at 797–98; *Almeciga*, 185 F. Supp. 3d at 426.

**i. The examiner's particular methodology did not follow the proper ACE-V methodology**

The most widely accepted methodology for handwriting analysis is the ACE-V method (analysis, comparison, evaluation, verification), and, admittedly, some circuits have held ACE-V methodology to be generally reliable. *See e.g.*, *United States v. McDaniels*, No. CRIM.A. 12-393-01, 2014 WL 2609693, at *5 (E.D. Pa. June 11, 2014) ("The Third Circuit has held … the ACE–V methodology to be generally reliable and scientifically sound.). Under the ACE-V method, experts follow four steps: analysis, comparison, evaluation, and verification. Here, it appears that the expert at least attempted to follow the first three steps of the ACE-V method. *See* Ex. 1, Expert Disclosure 4 (Analysis: "The first step in the forensic handwriting examination is to independently analyze the questioned and known material"); *id.* (Comparison: "Upon completion of these independent analyses, a detailed comparison of the individual features in the submitted writing is conducted."); *id.* (Evaluation: "Observations made during the comparison are evaluated based on

the examiner's training, experience, and education," and "[a]n opinion regarding authorship is formulated based on that evaluation."). However, there is nothing in the disclosures to suggest that the expert followed the final step: verification. [2]

This matters. Failing to follow the steps of ACE-V, "almost by definition," means the expert "misapplie[d] that methodology." *Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles, Inc.*, 763 F. App'x 787, 797 (10th Cir. 2019). The government has included nothing in its disclosures to attempt to justify Ms. O'Brien's deviation from ACE-V, or demonstrate that her methodology is reliable without verification. Indeed, the government's disclosures do not even admit that Ms. O'Brien skipped this final step.

This error is fatal, and the district court should preclude Ms. O'Brien from testifying because her expert disclosures have failed to justify her deviation from the standard ACE-V methodology. *Id.* at 797 (reversing district court decision to admit expert testimony that skipped verification step because record did not demonstrate the reliability of the ACE-V method without completing the verification step); *Almeciga*, 185 F. Supp. 3d at 426 (excluding expert that, among other things, did not obtain a verification).

---

[2] In a footnote, the government disclosed that the examiner's work was technically and administratively reviewed. Ex. 1, Expert Disclosure at 1 n.1. Neither an administrative review nor a technical review, however, amounts to verification. *See* Andrew Sulner, Critical Issues Affecting the Reliability and Admissibility of Handwriting Identification Opinion Evidence—How They Have Been Addressed (or Not) Since the 2009 NAS Report, and How They Should Be Addressed Going Forward: A Document Examiner Tells All, 48 Seton Hall L. Rev. 631, 671 (2018). An administrative review, the lowest level of review, merely checks that the final report is "coherent, reflects the examinations performed, and is free of spelling and grammar errors." *Id.* A technical review, the next level up, does not involve an examination of the actual evidence. Instead, an examiner, often using a checklist or worksheet, simply checks that procedures have been documented, any limitations are recorded, and the conclusions are supported. *Id.* at 671-72. A verification, on the other hand, is a review procedure in which a second examiner independently examines all the evidence and reaches his or her own conclusion. *Id.* at 672. It is verification that ACE-V requires.

### ii. Ms. O'Brien's application of handwriting analysis is otherwise unreliable

Even aside from the omission of the verification step of ACE-V, Ms. O'Brien's application of handwriting analysis is otherwise unreliable.

#### a. Other courts have rejected expert analysis under similar circumstances

Ms. O'Brien's expert report and supporting documents submitted by the government are opaque and fail to detail, in anything approaching a rigorous manner, how she went about the remaining ACE-V steps. For instance, although she answered "yes" to the form question asking whether the known writing was sufficient in quantity and quality for comparison, she never explained the basis for this conclusion—particularly troubling given that Mr. Moulden had only one writing sample and Mr. Copez's samples were blurry. Ex. 3, Expert Disclosure, Exhibit C at 9. *Cf. Almeciga*, 185 F. Supp. 3d at 422 (expert noting that she wanted a half-dozen to a dozen known samples to perform her analysis, while others request 25 or more). Beyond a handful of internal notes, she also failed to indicate why, across 75 pages of handwriting, certain penmanship flourishes were significant and others not. She did not begin to evaluate the 27 characteristics that her own report form suggests are appropriate to consider, instead preferring to focus almost exclusively on comparing letter forms. She did not explain how she distinguished discrepancies attributable to natural intra-person variation in letter forms from those that were not. She did not specify how many similarities or differences would be enough to establish a match or rule one out. She did not explain what made the bowl shape in a "D" "rounded" as opposed to a "pregnant belly." She did not account for why she compared certain letters across only a subset of the samples (for example, comparing "th" solely between the Letters at issue and Mr. Copez's sample). She did not illustrate visually the purported differences and similarities she identified by lining up

the Letters and the known samples. And she did not explain why the limitations she identified constituted limitations, or the degree to which they undermined her analysis.

Courts have recognized that even a subset of these shortcomings can support exclusion. For example, in *Agri-AFC, LLC v. Everidge*, 2019 WL 385421 (M.D. Ga. 2019), the district court excluded the handwriting examiner's report and her conclusions holding that her anticipated testimony failed the reliability prong under *Daubert*. In her expert report, the examiner stated that she had compared 81 documents and evaluated the "line quality, pressure patterns, rhythm, slant, size and proportions, utilization of space and spatial alignment, initial and terminal strokes, writing speed, legibility, skill level, letter forms, types of connectors, method of construction, and pattern formation." *Id* at *15. However, the court complained that "none of these terms [were] defined or specifically applied in the report to show what exactly Ms. Peterson did while evaluating the signatures." *Id.* Instead, the court criticized the report stating that it "merely offer[ed] several pages of signature samples with arrows and circles highlighting a particular part of each signature and noting the differences between them, but there [was] no explanation for why Ms. Peterson chose those parts of the signature to highlight as opposed to others. *Id.* The court concluded that the report "d[id] not present a reliable method by which Ms. Peterson reached her conclusion." *Id.*

Similarly, here, the examiner observed characteristics such as letter form, stroke, spatial alignment, height relationships, and slant; yet, the examiner did not define any of these terms or provide an explanation of why she chose certain parts of the over 75 pages of document to highlight as opposed to others. Ex. 3, Expert Disclosure, Exhibit C at 7, 9-10.

In fact, the case at bar is even worse than *Everidge* and even more demanding of exclusion. First, the laboratory form instructed the examiner to consider at least 27 different characteristics including punctuations, rhythm, shading, and tremor. Like *Everidge*, these characteristics were

not defined, which alone should be disqualifying. However, here, unlike in *Everidge*, there is no evidence the examiner even considered such prescribed factors (e.g., the examiner did not discuss rhythm, pen pressure, pen lifts, etc. whatsoever). And while the examiner listed certain factors (e.g., slant, beginning and ending strokes) in other aspects of her analysis, there is no indication that she considered those factors with respect to Mr. Copez's writing, or if she did, that they produced similarities or differences. *See, e.g.*, Ex. 3, Expert Disclosure, Exhibit C, at 22[3]. Instead, her analysis focuses almost exclusively on letter forms, one of the areas that is most easy for lay people to visualize the differences between and thus one of the characteristics to forge.

In addition, as noted, *Everidge* faulted the expert in that case for drawing the arrows and circles pointing out aspects of the signatures being compared without explaining why those aspects deserved special focus. This case, however, is even worse. Ms. O'Brien did not simply fail to explain her choices, she failed to make visual representations of the similarities and differences between the known samples and the Letters at all.

Instead, Ms. O'Brien provided only screenshots of the known handwriting, with text in the corner of a slide purporting to list differences (in the case of Gemmil, Halloway, and Moulden) and similarities (in the case of Copez). At no point did she even bothering to line those purported similarities or differences up with visuals of what she observed in the Letters. Indeed, she did not even include excerpts of the Letters on the same page where she purportedly explained her "comparison," as the Copez example below illustrates.

---

[3] Citation to page number of the PDF, rather than the document, because it is missing a page number printed on that page.




Ex. 3, Expert Disclosure, Exhibit C, at 22. Because Ms. O'Brien's analysis falls far below the analysis exclude in *Everidge*, exclusion is also an appropriate remedy here.

Or take another example. In *McDaniels*, a different district court excluded a handwriting examiner's testimony based on flaws that are similarly present here. First, the examiner "fail[ed] to provide evidence that she comprehensively compared the characteristics shared and not shared between each set of known and question documents. Only a few similarities between each pair are listed in the testimony, and no differences are listed." *United States v. McDaniels*, 2014 WL 2609693 (E.D. Pa. 2014). The court recognized that the analyst need not provide an "exhaustive illustration of every characteristic that was matched between the known writing sample and each of the six question documents," but criticized the analyst's report for "fail[ing] "to include a more comprehensive description of the specific characteristics that matched, and the specific dissimilarities, if any, present in each side-by-side comparison." *Id.* Second, the court complained that the analyst's testimony and report "fail[ed] to demonstrate how she conducted the balancing of identifiable characteristics shared and not shared between the known writing sample and each

question document." And third, the court faulted the analyst for "fail[ing] to provide any evidence in her testimony or expert report of how the [verification] step [was] met." *Id.*

Here, the examiner's report similarly fails on each of these grounds. First, the examiner provided no evidence that she compared the similarities and differences, let alone that she compared them "comprehensively." While the laboratory report asks the examiner to consider at least twenty-seven different characteristics, for each of individual, the examiner documented far, far few observations. The examiner only identified five comparison observations related to Mr. Copez, four of which pertain to a single characteristic: letterforms. Expert Disclosure, Exhibit C at 9. Further, for the comparison with Mr. Copez's writing, the examiner *only* documented similarities and for the comparison with Mr. Gemmill, Mr. Halloway, and Mr. Moulden, the *only* documented differences. Are we to believe that out of 75 pages of writing, there was not a single similarity between the writing of Mr. Gemmill, Mr. Halloway, or Mr. Moulden and the Letters? And not a single difference between the writing of Mr. Copez and the Letters, even though handwriting analysis is grounded in the idea that there is, in fact, variability in how the same individual writes across different samples? (Meaning, under the premise of handwriting analysis in general, even if Mr. Copez wrote the Letters there should still be at least some differences between them and his own samples.)

To make matters worse, Ms. O'Brien did not compare the same characteristics across all individuals. For example, the examiner stated that the "k" in the Letters appears to resemble a "V" with a leg. Ex. 3, Expert Disclosure, Exhibit C at 9. She stated this was similar to Mr. Copez's samples. *Id.* Yet, she provided no evidence that the "k" properties are dissimilar in Mr. Gemmill, Mr. Halloway, or Mr. Moulden's sample. For all we know, Mr. Gemmill, Mr. Halloway, and Mr. Moulden's writing share this same characteristic. This lack of a direct comparison (i.e. comparing

apples to oranges, rather than apples to apples) is not unique. In fact, the only characteristics that the examiner compared across all five samples was the letter "y" and the letter "a." Hence, the examiner is in effect drawing her conclusions based on only two cross-cutting data points. This is far from the "comprehensive" comparison for which *McDaniels*' calls.

In addition, like in *McDaniels*, Ms. O'Brien provided no information as to the balancing of similarities and differences. We do not even know if she performed such balancing, let alone how she did it. And third, as discussed at length above, the verification step was never completed here.

**b. Ms. O'Brien's reliance on spelling and grammar is inconsistent with general handwriting methodology**

Finally, in her purported "expert" analysis, Ms. O'Brien apparently considered spelling similarities and discrepancies between the Letters and the samples. Yet, no handwriting methodological guide indicates that such a comparison is appropriate.

In assessing whether the Letters are internally consistent, Ms. O'Brien states: "There are consistencies in … spelling (Sincerly) [and] grammar ("This is a admission"). Ex. 3, Expert Disclosure, Exhibit C. Neither the United States Secret Service standards cited in the government's expert disclosure agreement nor any other standards state that spelling or grammar should be a consideration in handwriting analysis. *See e.g.*, United States Secret Service Forensic Services Division, *Questioned Document Standard Operating Procedures* 6 (2024); American Academy of Forensic Sciences *Standard for Examination of Handwritten Items* (2022) (https://www.aafs.org/sites/default/files/media/documents/070_Std_e1.pdf). In fact, a report generated by the Department of Justice specifies that examiners do "not consider misspellings as individualizing characteristics of the handwriting." *Supporting Documentation for Department of Justice Proposed Uniform Language for Testimony and Reports for the Forensic Handwriting*

*Analysis Discipline* 6 (https://www.justice.gov/archives/dag/file/877751/dl?inline=). The government provided no information regarding the impact of her unauthorized spelling and grammar comparison on the examiner's analysis. This, too, supports exclusion.

**IV. In the alternative, the Court should narrow the examiner's testimony**

Alternatively, the Court should allow the examiner's testimony about the similarities and differences between handwriting samples and exclude testimony about conclusions as to the authorship or degree of confidence or certainty on which her opinions are based. If they do not exclude the expert's testimony in its entirety, many district courts follow this approach. *See e.g.*, *Rutherford*, 104 F.Supp.2d; *Hines*, 55 F.Supp.2d; *Oskowitz*, 294 F.Supp.2d; *Barnett v. American Heritage Life Ins. Co.*, 2007 WL 7611186 (W.D. Tenn. 2007); *Legacy Vision, LLC v. Yeamans*, 2025 WL 6227149 (W.D. Okla. 2025); *Wolf v. Ramsey*, 253 F.Supp.2d 1323 (N.D. Ga. 2003). For example, in *Legacy*, while the court allowed the handwriting examiner to testify as to the "specific mechanics and characteristics of handwriting," the court excluded the examiner's "essentially subjective opinion" as to authorship and precluded the examiner from testifying as to the degree of confidence or certainty on which his opinions were based. *Legacy Vision*, 2025 WL 6227149 (quoting *United States v. Santillan*, 1999 WL 1201765 (N.D. Cal. 1999)). The court explained, "such testimony, when it is buttressed by the fact that it comes from an 'expert,' would appear to be more prejudicial and misleading than probative in the Court's consideration of the application of Rule 403 of the Federal Rules of Evidence." *Id.* Similarly, the court should exclude the examiner's testimony about authorship and degree of confidence or certainty on which her opinions are based.

## CONCLUSION

Given these deficiencies identified here, Mr. Copez is entitled to a *Daubert* hearing. *See Sardis*, 10 F.4th at 282 (noting that when a party challenges an opposing party's expert testimony as unreliable, "the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline'") (quoting *Kumho Tire*, 526 U.S. at 592). At the conclusion of that hearing, Counsel respectfully asks the court to apply the principles of *Daubert* and Rule 702 of the Federal Rules of Evidence and exclude or, at a minimum, limit the testimony of the government's proffered fingerprint expert.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER
/s/
TEZIRA ABE
COURTNEY L. MILLIAN
Assistant Federal Public Defender
625 Indiana Ave. N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500