**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MARQUIS COPEZ,**<br><br>**Defendant.** | **No. 8:25-cr-335 (FWV)** |

## GOVERNMENT'S OMNIBUS MOTION *IN LIMINE*

The United States of America, by and through undersigned counsel, respectfully submits this omnibus motion *in limine* in advance of trial, currently scheduled for August 3, 2026. Specifically, the United States seeks to: (1) preclude argument that the threats charged in the Superseding Indictment were not possible to effectuate and not directly communicated to the victims; (2) preclude defense that the defendant's statements are protected speech; (3) preclude third party perpetrator defense; (4) admit the defendant's recorded interviews; (5) preclude evidence or argument regarding the defendant's mental health; (6) take judicial notice of court filings; (7) permit the government's lead investigative agent for this case to sit at counsel table; and (8) to impeach the defendant with prior criminal convictions and to limit defense impeachment of government witnesses.

The government files these motions *in limine* to promote efficiency and reduce the need to argue objections mid-trial. Although neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence expressly contemplate motions *in limine*, the practice of allowing such motions has developed over time "pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n.4 (1984). Motions *in limine* "narrow the

evidentiary issues for trial and [] eliminate unnecessary trial interruptions." *Changzhou Kaidi Elec. Co., Ltd. v. Okin Am., Inc.*, 102 F.Supp.3d 740, 745 (D. Md. 2015) (quotations omitted). For each motion below, the government asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

## FACTUAL BACKGROUND[1]

As alleged in the Superseding Indictment, Marquis Copez (the "defendant") sent four letters threatening to assault, rape, or kill United States District Court Judges Chasanow and Hollander. Dkt No. 60. The defendant sent the four letters over the course of nine months, between May 2023 and January 2024, from the North Branch Correctional Institution ("NBCI"), a maximum-security prison in Cumberland, Maryland. The defendant signed the four letters in the names of four other NBCI inmates whom he had altercations with to (1) conceal his identity as the true author of the threatening letters, and (2) prompt a federal investigation into those other inmates. As a result, the Superseding Indictment charges the defendant with four counts of knowingly mailing a communication containing a threat to injure the person of another in violation of 18 U.S.C. § 876(c) and four counts of threatening to assault or murder a federal judge with intent to impede, intimidate, or interfere with her official duties in violation of 18 U.S.C. § 115(a)(1)(B).

### A. The Defendant's Incarceration at NBCI

From approximately January 2020 through 2025, defendant was incarcerated at NBCI after having been sentenced to eight years of incarceration for First Degree Assault on December 27, 2017. While the defendant was incarcerated at NBCI, he was incarcerated with, and personally

[1] These proffered facts constitute a portion of the evidence the government intends to present at trial but only includes the relevant information necessary to analyze the evidentiary issues presented in the motions *in limine*.

knew, each of the individuals whose names the defendant signed as the purported author of the letters charged in the Superseding Indictment. The defendant had altercations with each of these other NBCI inmates prior to sending the threatening letters. While each of these inmates know defendant personally, they do not know each other. Moreover, each of the four other inmates whose names the defendant signed to the letters charged in the Superseding Indictment did not know Judges Hollander or Chasanow. None of the four inmates had pending cases before those judges, or any other federal judge, at the time.[2]

Finally, as discussed below, the defendant was disciplined over 50 times while he was incarcerated at NBCI. The defendant's inmate rule violations ran the gamut: from acts of violence against other inmates and guards, to possessing weapons, to spitting on other inmates, to writing numerous threatening letters to female prison employees.

**B. The Defendant's Letters to Judge Chasanow**

Unlike the individuals whose names the defendant signed on the threatening letters, the defendant knew Judge Chasanow and knew that she was a District of Maryland judge. Indeed, the defendant had a pending civil lawsuit before Judge Chasanow when he sent the threatening letters. *See Copez v. Pratt et al.*, 1:23-cv-1127 (D. Md.) (Chasanow, J.). On April 26, 2023, the defendant filed a handwritten civil rights action alleging racial discrimination and assault against three NBCI employees. The defendant filed his complaint by mail addressed to the "Clerk of Court U.S. District Court 6500 Cherrywood Lane Greenbelt, Maryland 20770." The case was assigned to Judge Chasanow. On May 8, 2023, she denied defendant's motion for extension of time and motion to appoint counsel. *See id.* at Dkt No. 6.

[2] NBCI is a state facility, and the inmates were all serving state charges.

Just 23 days later, on or about May 31, 2023, the defendant sent the first threatening letter to Judge Chasanow, charged in counts one and two of the Superseding Indictment. The letter, which the defendant signed in the name of fellow inmate "Keenan Galloway,"[3] stated:



FILED
LOGGED

JUN 0 2 2023

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY DEPUTY

Dear Judge Deborah K. chasanow,
My name is Keenan Galloway 2853042 I am a member of BGF 276 and I Plan
to Kill Judge Ellen Hollander I am responsible For 90% of
Murders in Baltimore city and I am going to Do that again I am
locked up Right Now For attempted Murder My Mother work For
Probation and Parole This is a admission of my Guilt
and I will Kill Again. I am seeking to Be change
With Conspiracy to Murder and I am Seeking your
Assitance to Be charge with conspiracy to Murder
Which Holds Doable life If you Dont help me I'll
Kill you
Sincerly,
Keenan Galloway

On June 2, 2023, the defendant sent a second letter to Judge Chasanow, charged in counts three and four of the Superseding Indictment, purporting to be from fellow inmate "Eric Gemmil."[4] The letter stated:

[3] As discussed below, the defendant misspelled Keenan Holloway's name.
[4] As discussed below, the defendant misspelled the last name of his fellow inmate Eric Gemmill.

FILED ENTERED
LOGGED RECEIVED

JUN 07 2023

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY DEPUTY

Dear Judge Deborah K Chasanow,
My Name is Eric Gemmi, I have been incarcerated most of my life since a Juvenile. I have killed over 90 Black men an two Federal Judges. I hate all Niggers and I am responsible for a lot of unsolved Murders this is a admission of guilt and if you Dont help me I'll kill you this is the truth.
Sincerly,
Eric Gemmil

### C. The Defendant's Letters to Judge Hollander

The defendant also knew Judge Hollander and knew that she is a District of Maryland judge. Indeed, the defendant had two pending civil lawsuits before Judge Hollander when he sent the threatening letters. On January 5, 2023, the defendant mailed a handwritten lawsuit that was assigned to Judge Hollander alleging civil rights violations against NBCI employees. *See Copez v. Pratt, et al.*, 1:23-cv-19 (D. Md.). On February 23, 2023, the defendant mailed a handwritten filing addressed to Judge Hollander. *See id.* at Dkt. No. 4. On March 24, 2023, Judge Hollander dismissed the defendant's complaint without prejudice. *Id.* at Dkt. No. 7.

On February 17, 2023, the defendant filed a lawsuit that was assigned to Judge Hollander alleging civil rights violations against NBCI employees. *See Copez v. Drozda, et al.*, 1:23-cv-465 (D. Md.). Judge Hollander partially granted the defendant's motion to proceed in forma pauperis on April 26, 2023. *Id.* at Dkt. No. 8.

On November 27, 2023, defendant sent a letter to Judge Hollander, charged as counts five and six in the Superseding Indictment, purporting to be from fellow inmate Curtis Moulden. The letter stated:


Dear Judge Ellen lipton Hollander,

My name Curtis Moulden 3739522, I am a head member of Black Guerilla Family 276. I am reponsible For 90% of Murders that occured in 2017 to present. I will kill you and this is a Free admittance of my guilt. If you Don't help me By convicting me For conspriacy to Murder I will kill you Mc Dafon conty Joquan collins are all Planning to kill you this the truth so help I would like to be convicted under the 848 B Rico law Because if you Don't help me I will kill you when Im released in 2024

Sincerly,
Curtis Moulden

On January 25, 2024, the defendant sent a letter to Judge Hollander, charged as counts seven and eight in the Superseding Indictment, purporting to be from fellow inmate Dominick Simons. The letter stated:


Dear Judge Ellen Lipton Hollander,

My is Dominic Simon id number 2856775 I am a Federal inmate on a ICC I am currently at North Branch Correctional Insitution I am currently currently locked up for sexual assault on a minor 2017 it took place on subway car I am telling you now if I Don't get rebooked on 848 rico charge I will rape you Myself and kill your mother.

Sincelly
Dominic Simon 2856775

On November 18, 2024, Judge Hollander dismissed the defendant's complaint without prejudice. *Id*. at Dkt. No. 28.

### D. Initiation of the United States Marshal's Office Investigation into the Threatening Letters

The United States District Courthouse for the District of Maryland, Greenbelt Division received in the mail each of the four threatening letters charged in the Superseding Indictment.

When mail is sent to the District Courthouse, a United States Postal Service worker (or other mail delivery service employee) delivers the mail to a locked room near the clerk of court's office. When mail is received, an employee within the clerk of court's office opens the mail and sorts it to ensure that it routes to the proper location. The mail is physically stamped with the date that it is opened. Generally, mail that is addressed to the court is scanned. The clerk's office policy is to preserve physical mail for at least 30-days before destroying it. That policy was in effect when each of these letters was received. Here, the first two threatening letters charged in the Superseding Indictment were destroyed pursuant to the clerk of court's established policy, however, both of these letters were fully scanned at the time of receipt. The second two threatening letters were preserved and remain in government custody.

During the mail intake process, the clerk's office reads the mail both to determine the appropriate recipient of the mail and to determine whether there are any concerns with the content of the mail—like threatening language. When a clerk's office employee detects threatening language, the letter is given to the Case Administration Supervisor in the clerk's office. The Case Administration Supervisor then elevates the threatening letter to the Clerk of Court and, at times, the United States Marshal Service.

Here, while each of the threatening letters were mailed to Judge Chasanow or Judge Hollander, the clerk's office was the initial recipient. The threatening letters were provided to the Case Administration Supervisor and then to the United States Marshals Service.

The Marshals' mission is to protect the federal judiciary. In response to receiving each threatening letter alleged in the Superseding Indictment, the Marshals initiated an investigation to determine the identity of the author of the letters. As part of its investigation, the Marshals interviewed or attempted to interview each of the purported authors of the letters. On June 08,

2023, the Marshals separately conducted recorded interviews of Keenan Holloway and Eric Gemmill. During the interviews, Holloway and Gemmill both denied writing the letters and neither had ever heard of Judges Hollander or Chasanow. Amongst other things, both inmates stated they believed the defendant wrote the letters. Both Mr. Holloway and Mr. Gemmill stated that after they had an altercation with the defendant, the defendant told them that he would write a letter to a judge to increase their sentences. On March 21, 2024, the Marshals interviewed Dominick Simons. Similarly, Simons denied writing the letters and had never heard of Judges Hollander or Chasanow. Simons stated he believed the defendant wrote the letters because the defendant told Simons he would write a letter to a judge to increase his sentence after they had an altercation.[5]

The Marshals interviewed the defendant on June 8, 2023 and September 26, 2024. In both interviews, defendant denied writing any of the letters. In the June 2023 interview, unprompted, defendant said that "Galloway" and "Gemmil" wrote the letters and each had separately threatened to write the letters to Judge Chasanow.[6] The defendant also attempted to blame two other inmates who have no connection to this case. Importantly, the defendant admitted that he knew Judges Chasanow and Hollander and had pending civil lawsuits before them.[7] In the September 2024 interview, the defendant blamed Curtis Moulden and Dominick Simons for writing the November 2023 and January 2024 letters, respectively. Again, the defendant claimed that both Moulden and Simons each separately threatened to write Judge Hollander threats to increase the defendant's sentence. Towards the end of the interview, the defendant then blamed a different inmate with no

[5] Marshals attempted to speak with Curtis Moulden who would not speak to law enforcement.
[6] Defendant misspelled Holloway and Gemmill in the interviews. Defendant's misspelling was consistent with the misspellings in the letters.
[7] *See Copez v. Pratt, et al.*, 1:23-cv-19 (D. Md.) (Hollander, J.); *Copez v. Drozda, et al.*, 1:23-cv-465 (D. Md.) (Hollander, J.); *See Copez v. Pratt et al.*, 1:23-cv-1127 (D. Md.) (Chasanow, J.).

connection to this case. The defendant also provided a writing sample. In the writing sample, he misspelled "sincerely" as "sincerly"—the same way each letter misspells it.

The investigation did not stop with interviews—fingerprint, handwriting, and DNA experts also analyzed the threatening letters. Fingerprint analysis returned only one set of inmate fingerprints: defendant's.[8] *See* Exhibit 1. Similarly, handwriting analysis concluded that defendant is the "probable" author of the letters charged in the Superseding Indictment. *See* Exhibit 2. DNA analysis returned no DNA results from two letters that were tested. *See* Exhibit 3.

### E. The Defendant's Disciplinary History at NBCI.

The government's evidence also includes evidence of the defendant's history of writing threatening letters similar to the letters charged in the Superseding Indictment. The Defendant has been disciplined fifty times at NBCI. Relevant to this case, at least six of the defendant's rule violations were for writing threatening letters to female prison employees:

- On January 12, 2023, the defendant was disciplined for writing a letter to a female correctional officer threatening to sexually assault her. *See* Exhibit 4. The Defendant pleaded guilty to the inmate rule violation.[9] *Id.*

- On March 15, 2023, the defendant was disciplined for writing a letter to correctional officers "containing various forms of coercion and attempt[ing] to garner money from the[] officers." *See* Exhibit 5. The Defendant pleaded guilty to the rule violation. *Id.*

---

[8] Defendant's fingerprint was discovered on the mailing purportedly sent from Curtis Moulden. No other inmate's fingerprints were identified on the two letters and envelopes analyzed. The only other fingerprints identified from the mailings were from District Court employees that handled the letters.

[9] Maryland Code of Regulations 12.03.01 governs the Inmate Disciplinary Process. The inmate disciplinary process is a formal hearing that includes investigation and reporting, service and notice of a violation, a hearing, and discipline. *Id.* at 12.03.01.05-23. A Notice of Inmate Rule Violation provides an inmate with notice of the alleged rule violation. *Id.* at 12.03.01.04. The most severe inmate rule violations are designated Category IA, which includes "threats that include the use of physical harm to objects, property, or individuals." *Id.* A guilty plea to an inmate rule violation is a voluntary admission by the inmate that the Notice of Rule Violation is admitted. *Id.* at 12.03.01.20 (B).

- On April 28, 2023, the defendant wrote a letter to a correctional officer threatening to sexually assault her and asking her for money. *See* Exhibit 6. The defendant pleaded guilty to the rule violation. *Id.*[10]

- On December 1, 2023, the defendant wrote a letter to a correctional employee describing sexually explicit acts that he wanted to do to her. *See* Exhibit 8. Defendant pleaded guilty to the rule violation. *Id.*

- On February 25, 2025, the defendant wrote a letter to a correctional employee describing sexually explicit acts that he wanted to do to her. *See* Exhibit 9. Defendant pleaded guilty to the rule violation. *Id.*

- On April 1, 2025, defendant wrote a letter to a correctional employee describing sexually explicit acts that he wanted to do to her. *See* Exhibit 10. Defendant plead guilty to the rule violation. *Id.*

In addition to the threatening letters, the defendant was recorded on a jail call communicating a threat to a fellow inmate. On November 20, 2025, defendant called an individual with computer access and asked him to look up a fellow inmate's State Identification Number ("SID")[11] and home address. During that recorded call, the defendant can be heard telling that individual that he was having a dispute with a fellow inmate. The defendant advised the individual on the other end of the call that he was getting out of jail soon. After receiving his fellow inmate's SID number and home address, the defendant can be heard threatening a fellow inmate by telling him his home address. The threat implied is that the defendant knows where his fellow inmate's family resides outside of prison and with that knowledge, he could cause them harm when he is released.

[10] On May 26, 2023, the defendant was disciplined for breaking the fire suppression system and causing a flood. This rule violation led to an altercation with Keenan Holloway. *See* Exhibit 7.
[11] An SID is an unique identifier that is assigned to an individual when he or she is incarcerated. An SID is publicly available on the internet, but is not typically shared within the prison.

## MOTIONS *IN LIMINE*

### I. Motion to Preclude Argument that the Threats Charged in the Indictment Were Not Possible to Effectuate and Not Directly Communicated to the Victims.

The Court should preclude the defense from presenting evidence or arguing that the defendant is not guilty because he could not carry out the threats charged in the Superseding Indictment or that he is not guilty because Judges Hollander and Chasanow did not directly receive the letters threatening to rape and kill them.

Both statutes charged in the Superseding Indictment require the government to prove a "true threat." A "true threat" "is one that a reasonable recipient familiar with the circumstances would interpret as a serious expression of an intent to do harm." *United States v. White*, 810 F.3d 212, 219 (4th Cir. 2016) (internal quotations omitted). The government must prove the defendant "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman v. Colorado*, 600 U.S. 66, 69 (2023). The prohibition on "true threats" is to protect individuals from the fear of violence. *Virginia v. Black*¸ 538 U.S. 343, 359-60 (2003).

A defendant's ability to effectuate a "true threat" is irrelevant. *United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009). "[A] defendant's inability to carry out specific threats does not render them unthreatening or harmless." *Id.* Similarly, it is irrelevant that a defendant never intended to actually carry out the threats. *United States v. Stewart*, 420 F.3d 1007, 1019 n.9 (9th Cir. 2005); *United States v. Velasquez*, 772 F.2d 1348, 1357 (7th Cir. 1985) ("The argument that if there is no intent to carry through, the threat is a pure exercise in freedom of speech . . . misconceives the nature of threats. When making a threat one hopes not to have to carry it out; one hopes that the threat itself will be efficacious. Most threats, indeed, are bluffs. But if the bluff succeeds in intimidating the threatened person, or at least . . . is intended to succeed, it ought to be punished").

In *United States v. Davila*¸ a defendant was convicted of sending a letter that contained baby powder and the word "anthrax" to a state prosecutor he held a grudge against. 461 F.3d 298, 300 (2d Cir. 2006). The defendant argued that since the letter came from an inmate, no reasonable recipient could have taken it seriously. *Id.* at 305. The Second Circuit rejected the argument and held that a reasonable recipient could conclude that the letter was threatening despite the fact that an inmate is unlikely to have access to anthrax. *Id.* The same logic applies to this case.

Here, the defendant's ability to harm Judges Hollander and Chasanow or his intent to actually effectuate the threats is not an element of the offense and accordingly is not a fact question for the jury to decide. As a result, whether the defendant was capable of carrying out the threats or intended to actually do so is irrelevant.

Further, as a factual matter, a reasonable recipient of the letter would understand that, except for life sentences, inmates are released from prison. And the content of the letters charged in the Superseding Indictment clearly indicate a desire for each of the purported authors to receive an increased sentence. Therefore, it follows that an increased sentence is only necessary because the inmate will soon get out of prison and if the judges do not initiate an investigation and increase their sentences, the threat will be acted upon when released.

The defendant should therefore be precluded from presenting evidence or arguing that he is not guilty because he was incapable of carrying out the threats in the letters or never intended to actually do so.

The Court also should preclude the defendant from arguing that Judges Hollander and Chasanow did not directly receive the threats and thus he is not guilty. A "true threat" does not need to be communicated directly to the intended victim. *See United States v. Lockhart*, 382 F.3d 447, 451 (4th Cir. 2004) (upholding conviction of a defendant who delivered a letter threatening

to kill the president that was delivered to a grocery store employee); *United States v. Siegler*, 272 F.3d 975, 978-79 (7th Cir. 2001) (affirming conviction under § 876 based on a letter sent to defendant's associate threatening him to murder a prosecution witness); *United States v. Martin*, 163 F.3d 1212, 1216 (10th Cir. 1998) (holding true threats do not need to be made directly to the victim and affirming conviction under § 115); *see also D'Amario v. United States*, 403 F.Supp.2d 361, 378 (D.N.J. 2005) (holding "direct communication to the person threatened is not required for a conviction under [§115]."). A "true threat" need not be directly communicated to a victim because the "true threats" doctrine protects against "the fear of violence and to the many kinds of disruption that fear engenders." *Counterman*, 600 U.S. at 74 (citations omitted).

The government anticipates that the defendant may argue that the letters were not "true threats" because the District of Maryland's clerk's office was the first recipient of the mailed letters charged in the Superseding Indictment, not the judges. That argument is misleading and legally incorrect.

To start, the defendant did communicate the threats directly to the victims—he addressed each of the letters charged in the Superseding Indictment directly to the judges' chambers. So as a factual matter, the defendant intended that the judges receive the threatening letters. When the clerk's office received the letters, they were reported to the Marshals Service. This demonstrates that the clerk's office identified the letters as "true threats."

Moreover, the judges did not need to directly receive the letters because a true threat need not be directly communicated to the victim. The fact that the clerk's office was the first recipient is irrelevant because the defendant intended to communicate "true threats"—to assault, rape, or kill the judges—directly to them. The law only requires that the defendant recklessly disregarded that his words communicate a serious expression that he means to commit an act of unlawful

violence. This is because, as *Counterman* emphasized, victims and society must be protected from the fear of violence that "true threats" engender.

Allowing the defense to make arguments about how the defendant was incapable of carrying out the threats, or how the judges did not actually receive the threatening letters serves only to confuse and mislead the jury by injecting an incorrect legal standard into the proceeding. Accordingly, the Court should preclude any such arguments by the defense.

## II. Motion to Preclude Defense that Defendant's Statements are Protected Speech.

The Court should preclude the defendant from arguing that the statements charged in the Superseding Indictment were protected speech under the First Amendment. The defendant is charged with knowingly mailing a communication containing a threat to injure the person of another in violation of 18 U.S.C. § 876(c) and threatening to assault or murder a federal judge with intent to impede, intimidate, or interfere with her official duties in violation of 18 U.S.C. § 115(a)(1)(B). Whether certain speech is protected by the First Amendment is not an issue that the jury will decide. *See Connick v. Myers*, 461 U.S. 138, 148 n. 7 (1983) ("The inquiry into the protected status of speech is one of law, not fact."). "Speech integral to criminal conduct, such as fighting words, threats, and solicitations, remain categorically" outside the protection of the First Amendment. *United States v. White*, 610 F.3d 956, 960 (7th Cir. 2010).

As previously stated, both statutes charged in the Superseding Indictment require the government to prove a "true threat." A "true threat," in the context of the charged statutes, "is one that a reasonable recipient familiar with the circumstances would interpret as a serious expression of an intent to do harm." *United States v. White*, 810 F.3d 212, 219 (4th Cir. 2016) (internal quotations omitted). The government must prove the defendant "consciously disregarded a

substantial risk that his communications would be viewed as threatening violence." *Counterman*, 600 U.S. at 69.

The First Amendment is irrelevant to the jury's determination of defendant's guilt or innocence. If the jury finds that defendant's statements were "true threats," the First Amendment offers no refuge. Conversely, if the jury finds the statements in the letters were not "true threats," the defendant is not guilty of the charged conduct regardless of whether his speech is protected by the First Amendment. Therefore, any reference to freedom of speech or the First Amendment will only mislead the jury and risk them basing their verdict on something other than the questions before them.

## III. Motion to Preclude Third Party Perpetrator Defense.

The defendant has blamed unrelated third-party inmates for the criminal conduct charged in the Superseding Indictment. However, the defendant is legally precluded from doing so at trial without evidence. And the government currently is unaware that any such evidence exists. As such, the government respectfully requests the Court exclude any evidence, cross-examination, argument, or other reference in support of an anticipated defense theory that a third-party perpetrator committed the offenses charged in the indictment.

### A. Legal Standard

A criminal defendant cannot introduce evidence of a third-party perpetrator unless he first establishes a sufficient nexus between the alleged third-party perpetrator and the charged offense. Although criminal defendants have the right to introduce exculpatory evidence at trial, that right is not unlimited. *United States v. Scheffer*, 523 U.S. 303, 308 (1998). A court must balance the admission of relevant evidence probative of the defendant's guilt or innocence against "the exclusion of prejudicial, misleading, and confusing evidence." *United States v. Jordan*, 485 F.3d 1214, 1218 (10th Cir. 2007).

Routinely, courts hold that an alternative perpetrator theory of defense is excluded from trial without sufficient evidence connecting third parties to the alleged criminal conduct. Evidence of an alternative perpetrator is only admissible if "'there is a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant.'" *United States v. Hicks*, 307 F. App'x 758, 761 (4th Cir. 2009) (quoting *DiBenedetto v. Hall*, 272 F.3d 1, 8 (1st Cir. 2001)). This is so because "[t]he potential for speculation into theories of third-party culpability to open the door to tangential testimony raises serious concerns. A court . . . must ensure that the defendant shows a sufficient . . . nexus between the crime charged and the asserted alternative perpetrator." *United States v. Hendricks*, 921 F.3d 320, 331 (2d Cir. 2019) (holding that "none of the evidence places [the third-party perpetrator] anywhere near the robbery scene or suggests that he was otherwise involved in the crime.") (quotations omitted). Evidence of animus alone is insufficient to assist the jury's determination of guilt or innocence. *Wade v. Mantello*, 333 F.3d 51, 60-61 (2d Cir. 2003). Under well-established law, the defendant cannot assert an alternative perpetrator defense because the claim an alternative perpetrator committed the offense is not supported by any evidence, instead it is based on the defendant's mere speculation.

**B. Argument**

The defendant cannot allege an alternative third-party wrote the threatening letters at issue in the Superseding Indictment because there is insufficient evidence to do so.[12] During law enforcement interviews, the defendant asserted that two other individuals wrote the threatening

[12] The government's argument does not extend to Keenan Holloway, Eric Gemmill, Curtis Moulden, or Dominick Simons. The government alleges that defendant forged these individuals' signatures on the threatening letters. The government does not argue defendant cannot seek to blame these individuals. Rather, the government's argument is limited to blaming a specific third-party beyond these four individuals because there is insufficient evidence to allege any other specific third-party sent the letters.

letters—T.W. and D.B.[13] However, no evidence supports the defendant's theory other than his mere speculation.

In a June 2023 law enforcement interview, the defendant claimed T.W. wrote the threatening letters because T.W. had previously signed the defendant's name on a letter threatening to kill the president. However, there is no evidence of any letter threatening to kill the president sent from T.W. or the defendant. The defendant said the United States Secret Service ("USSS") investigated this purported threatening letter. But there is no evidence to support the defendant's self-serving claim. Pursuant to a search of a law enforcement database,[14] no records were located regarding a USSS investigation into T.W. *See* Exhibit 11. Therefore, the defendant should not be able to argue T.W. sent any of the letters.

Similarly, without evidence, the defendant claimed D.B. wrote the threatening letters in his September 2024 law enforcement interview. Tellingly, the defendant only claimed D.B. wrote the letters after being confronted with powerful evidence. During the interview, Marshals told the defendant his fingerprints were found on one of the letters and a handwriting examiner determined that he is the "probable" author of the letters. During the September 2024 interview, Marshals requested the defendant provide them with a writing sample. The defendant provided the Marshals with a sample, and in that writing sample the defendant misspelled *sincerely* as "sincerly." The valediction in every letter is misspelled as "sincerly"—the same way the defendant misspelled it during his law enforcement interview. Marshals also revealed this misspelling to the defendant during the interview. After all of this evidence was disclosed—and after the defendant attempted

[13] The government refers to these individuals by initial for safety reasons.
[14] The database that was searched is maintained by the USSS and includes individuals who are subjects of protective intelligence investigations by member agencies.

to blame each of the purported authors of the letters—the defendant then stated, "Do you want me to give up the person that wrote it? Because I'll give you the person that wrote it. D.B."

The defendant's incredulous theory was speculation, at best, during the interview and would be speculation at trial. There is no known evidence supporting that D.B. has a connection to the letters charged. Based on a review of all Maryland federal cases on Pacer, neither D.B. nor T.W. had any case in Maryland Federal Court including before Judge Hollander or Judge Chasanow. Moreover, the circumstances surrounding defendant's statements during the interview demonstrate the plain falsity of his allegation against D.B. Therefore, the defendant should not be able to blame D.B. without any evidence because it risks confusing the jury.

Although at present the government is unaware of any additional alternative third-parties the defendant may attempt to blame, it anticipates that the defendant may conjure up other names during trial. If so, the defendant must meet the threshold standard required to introduce an alternative third-party perpetrator theory and prove that there is a sufficient nexus between the alleged perpetrator and the alleged crimes beyond mere speculation or alleged animus. Otherwise, such evidence must be excluded from trial as it will only confuse and mislead the jury.

## IV. <u>Motion to Allow Government's Admission of Defendant's Recorded Interviews.</u>

The government intends to admit and publish inculpatory portions of the defendant's two recorded law enforcement interviews. The government also moves to bar the admission of self-serving hearsay statements made by the defendant during these interviews.

Pursuant to Federal Rule of Evidence 801(d)(2), the government is permitted to introduce any inculpatory statements by the defendant into evidence. However, Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson v. United States*, 512 U.S. 594, 600-01 (1994). Only those declarations or remarks within a statement "that are individually self-

inculpatory" are admissible. *Id*. at 599. The reason for this rule is that "[s]elf-exculpatory statements are exactly the ones which people are most likely to make even when they are false…." *Id.* at 600; *see also United States v. Ferrell*, 816 F. 3d 433, 439 (7th Cir. 2015) ("the court must examine a declarant's narrative to separate a declarant's exculpatory statements from the inculpatory statements, and then exclude the exculpatory statements.")

The government may seek to admit into evidence portions of defendant's law enforcement interviews pursuant to Rule 801(d)(2). There are at least two portions of the law enforcement interviews the government intends to admit at trial.[15] First, in the June 8, 2023 interview, the defendant admits that he knows Judges Hollander and Chasanow. Second, in both the June 8, 2023 and September 26, 2024 interviews, the defendant misspells words and names in the interview that also are misspelled in the threatening letters which demonstrates consistent language usage that evinces the defendant as the true author of the letters. The remainder of the defendant's recorded interviews contain his own self-serving statements, including the defendant denying mailing the threatening letters to Judges Hollander and Chasanow.

The government moves to bar the defendant from introducing into evidence excerpts of self-serving hearsay and/or otherwise irrelevant statements made during the two recorded interviews. Based on the government's limited intended use of the excerpts of the interviews, any further excerpts of those recordings are not admissible pursuant to the "rule of completeness," under Federal Rule of Evidence 106 which applies "when a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered

[15] The government reserves the right to move for admission of additional portions of the interviews. If so, the government will identify any additional interview excerpts on its forthcoming exhibit list.

contemporaneously with it." *United States v. Hassan*, 742 F.3d 104, 134 (4th Cir. 2014) (cleaned up). "[T]he rule of completeness does not render admissible … evidence which is otherwise inadmissible under the hearsay rules[,] nor does the rule of completeness require the admission of self-serving, exculpatory statements made by a party which are being sought for admission by that same party." *Id.* A defendant cannot use the rule of completeness to circumvent the hearsay rules or to admit self-serving statements.

Of course, the defendant may make any self-exculpatory statements if he takes the witness stand. But if he does not testify, he does not have license to circumvent the rules of evidence. The Court should grant the government's motion *in limine* and forbid the defendant from introducing his own self-serving hearsay statements at trial from the two law enforcement interviews.

## V. <u>Motion to Preclude Evidence or Argument Regarding Defendant's Mental Health.</u>

The defendant, his attorneys, and any witness, should be precluded from introducing evidence, asking any question, or making any statement regarding defendant's mental health. As a threshold matter, counsel for the defendant has not filed any motion pursuant to Federal Rule of Criminal Procedure 12.2 that it intends to proceed with an insanity defense or introduce expert evidence "relating to a mental disease or defect or other mental condition of the defendant . . . ." *See* Fed. R. Crim. P. 12.2(a) and (b). Any such motion should have been filed "within the time provided for filing a pretrial motion" although the Court may, for good cause, allow late notice. *Id.* Because no notice has been filed as of the date of this filing, such evidence should be precluded.

To the extent defense counsel intends to question lay witnesses about their impressions of the defendant's mental health based on their interactions with him, such questioning also should be excluded. Under Federal Rule of Evidence 701:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful

> to clearly understand the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other special knowledge within the scope of Rule 702.

A lay witness would not have the requisite training and experience to opine on defendant's psychological state, nor would they have any sort of scientific assessment of the defendant's mental capacity. Accordingly, any such testimony would be pure speculation and unhelpful to the jury.

## VI. Motion to Take Judicial Notice of Court Filings

The Court should take judicial notice of defendant's public court filings in his three federal court cases before Judges Hollander and Chasanow. On January 5, 2023, defendant filed a lawsuit alleging civil rights violations against prison guards. *See Copez v. Pratt, et al.*, 1:23-cv-19, Dkt. No. 1 (D. Md.). Judge Hollander was assigned to this case and on March 24, 2023, she dismissed the defendant's complaint without prejudice. *Id.* at Dkt. No. 7. On March 6, 2023, the defendant filed a different lawsuit assigned to Judge Hollander alleging civil rights violations against prison guards. *See Copez v. Drozda, et al.*, 1:23-cv-465, Dkt. No. 4 (D. Md.). This case was active when the defendant sent the threatening letters. Finally on April 26, 2023, the defendant filed another lawsuit alleging civil rights violations against prison guards. *See Copez v. Pratt et al.*, 1:23-cv-1127, Dkt. No. 1 (D. Md.). Judge Chasanow was assigned to this case, and the case was active when the defendant sent the threatening letters. The defendant made many handwritten filings in each of the cases and submitted those filings by mail, addressed to Judges Chasanow and Hollander. The Court should take judicial notice of the existence of the lawsuits and any filings made in the lawsuits.

Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "that is not subject to reasonable dispute," meaning that it: (1) "is generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Courts are permitted to "take judicial notice of the

proceedings of another court," but may not "take judicial notice of another court's findings of fact for the truth asserted therein because such facts are usually disputed. *Corbitt v. Baltimore City Police Department*, 675 F.Supp.3d 578, 586-87 (D. Md. 2023) (quoting *Hughes v. Freightliner, LLC*, No. 7:04-cv-00309, 2006 WL 1842997, at *1 (W.D. Va. June 29, 2006). A court may take judicial notice of documents filed in other proceedings to establish the fact of the litigation and any related filings. *Id.*; *see also Barrett v. Pearson*, 355 Fed. Appx. 113, 116-17 (10th Cir. 2009) (taking notice of a prisoner's filing to prove he was not prejudiced by lack of access to legal material).

Here, the Court should take judicial notice of the fact of the defendant's prior lawsuits before Judges Chasanow and Hollander, including all entries on those dockets. The filings are not noticed for any truth asserted in the filings. Rather, the judicial notice only extends to the fact of the lawsuit and the documents filed in those lawsuits. The government's handwriting expert used the defendant's handwritten motions as examples of defendant's handwriting. The defendant's filings also establish his knowledge of the judges and the address of the District of Maryland Court that the threatening letters were sent to. The government intends to admit certain filings through a proper witness—not for the truth of the filings—but as an example of the defendant's handwriting and as evidence of his knowledge of Judges Chasanow and Hollander. The Court should take judicial notice of the fact of the lawsuits and any filings made in those lawsuits.

## VII. <u>Motion to Permit Lead Investigative Agent to Sit at Counsel Table</u>

The Court should permit the government's lead investigative agent to sit at counsel table during trial. Federal Rule of Evidence 615 provides that upon a party's request or by its own authority, a court "must order witnesses excluded so that they cannot hear other witness' testimony." Commonly referred to as the "rule on witnesses," Rule 615 "is designed to discourage

and expose fabrication, inaccuracy, and collusion[,]" of witness testimony. *Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625, 628 (4th Cir. 1996).

However, Rule 615 explicitly exempts from sequestration "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney." Fed. R. Evid. 615(b); *United States v. Parodi*, 703 F.2d 768, 773 (4th Cir. 1983) (holding the court "has a right to make an exception from a general rule of sequestration in favor of the chief investigating agent of the government involved in a trial."). Here, the government's lead investigative agent satisfies the exemption, and the government respectfully requests the Court grant its motion.

## VIII. Motion to Impeach Defendant with Prior Criminal Convictions and to Limit Defense Impeachment of Government Witnesses Beyond Permissible Scope.

The government moves to impeach the defendant with his prior felony conviction of First-Degree Assault—the conviction for which he was serving a ten-year sentence when he authored and mailed the threatening letters—if the defendant testifies at trial. Relatedly, the government moves to limit the defense's cross-examination of witness' prior criminal history beyond the permissible scope.

Federal Rule of Evidence 609 permits the admission of a defendant's prior convictions for purposes of impeachment, if the "crime . . . was punishable by death or by imprisonment for more than one year" and "the probative value of the evidence outweighs its prejudicial effect." Fed. R. Evid. 609(a)(1)(B); *see also United States v. Hernandez*, 106 F.3d 737, 739-40 (7th Cir. 1997). There are five factors courts consider when determining the appropriate balance between the probative value of evidence and the prejudicial effect: "(1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness' subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony;

and (5) the centrality of the credibility issue." *Hernandez*, 106 F.3d at 739-40; *United States v. Moore*, 917 F.2d 215, 234 (6th Cir. 1990). The burden rests with the proponent to establish that the probative value outweighs its prejudicial effect. *United States v. Cunningham*, 638 F.2d 696, 697 (4th Cir. 1981).

When a jury considers testimony of witnesses with criminal records, courts "have emphasized the importance of the credibility factor when the defendant's testimony is pitted against that of the government witnesses." *United States v. Pritchard*, 973 F.2d 905, 909 (11th Cir. 1992). In *Pritchard*, the Eleventh Circuit explained, "the jury had before it the criminal record of [the testifying co-defendant]. Thus, [the defendant's] criminal record, or the absence thereof, took on special significance. We conclude that the district court correctly saw the credibility of [the defendant's] own testimony as vital." *Id*. (citation omitted). There, the Eleventh Circuit held that the probative value of the defendant's conviction outweighed its prejudicial effect since the defendant's credibility was a key issue. *Id.* Therefore, cross-examination on prior criminal convictions requires a careful balancing analysis, but if other witnesses are impeached with prior criminal history, it increases the probative value of a defendant's prior convictions.

### A. The Defendant's Prior First-Degree Assault Conviction is Proper Impeachment Material.

If the defendant testifies, the government may impeach the defendant with the fact of his First-Degree Assault Conviction. The defendant was convicted of First-Degree Assault and sentenced to eight years' incarceration on December 27, 2017. The government may, under Rule 609(1)(1)(B), use the prior conviction to impeach the defendant's character for truthfulness. This is the offense the defendant was incarcerated for when he wrote the threatening letters. Therefore, the fact of the offense is essential to establish that the defendant was incarcerated at NBCI and what he was incarcerated for at NBCI.

The government does not intend on examining facts underlying the conviction. Instead, the government's impeachment would be limited to the fact of the specific conviction to attack the defendant's credibility. Although the government cannot predict the scope of necessary impeachment—because the government cannot predict what defendant will testify to—it presently does not intend on examining beyond the fact of the convicted offense.

The probative value of this information is essential. In addition to impeaching the defendant's credibility, it establishes that the defendant was incarcerated and why he was incarcerated which is necessary to prove the charges in the Superseding Indictment. The prejudicial value is limited. The jury will understand that the defendant is currently incarcerated and was incarcerated at the time of the offense. The threatening letters were mailed from NBCI, so the fact that defendant was incarcerated is inextricably linked with the charges. The government merely intends to establish why the defendant was incarcerated during the relevant time period. The Court should permit the government to impeach the defendant with his prior felony conviction for First-Degree Assault.

### B. The Court Should Limit the Defense's Impeachment of Government Witnesses to the Fact of the Convictions—Nothing Further.

The defense should be held to the same standard as the government: Impeachment is limited to the fact, but not substance, of prior felony convictions. In its case-in-chief, the government may present witnesses that were incarcerated with the defendant while housed at NBCI. While the defense may impeach those witnesses with their prior felony convictions, it would be inappropriate for the defense to probe further into the facts of the criminal convictions of these potential witnesses.

There are four potential inmate witnesses the government may call: Keenan Holloway, Eric Gemmill, Curtis Moulden, and Dominick Simons. These potential witnesses are the purported

authors of the threatening letters charged in the Superseding Indictment and were incarcerated with the defendant. At the time the threatening letters were mailed from NBCI, these four potential witnesses were incarcerated for the following offenses:

- Keenan Holloway: First-Degree Assault.
- Eric Gemmill: Second Degree Assault.
- Curtis Moulden: Armed Robbery, Robbery, and First-Degree Assault.
- Dominick Simons: Armed Robbery, Robbery, and First-Degree Assault.

Although the probative value of the inmate witness' prior felony convictions is significant because it establishes that the witnesses were incarcerated at NBCI during the relevant time period, any cross-examination beyond those facts is unduly prejudicial. Unless testimony establishes otherwise, the facts of the inmate witness's prior convictions is irrelevant to the charges alleged in the Superseding Indictment. The inmate witness's crimes of conviction were not crimes of dishonesty or forgery. They do not establish that these witnesses had prior felony convictions consistent with those charged in the Superseding Indictment. Instead, they are violent crimes that do not have a tendency to make any fact more or less probative and do not help the jury make a credibility determination. Accordingly, the defense should be limited in its impeachment to the same standard the government is: unless the door is opened by contrary testimony, the defense's cross-examination should be limited to the fact of the witness's conviction.

## CONCLUSION

For the foregoing reasons, the United States of America respectfully requests that the Court grant the government's Motions *in Limine*.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: */s/ Lauren Ibanez*
LAUREN IBANEZ
Special Assistant United States Attorney
Acting Under Authority Conferred by 28 U.S.C. § 515
NJ Bar No. 261642019
Lauren.Ibanez@usdoj.gov

By: */s/ Samuel Marquis Deau*
SAMUEL MARQUIS DEAU
Special Assistant United States Attorney
Acting Under Authority Conferred by 28 U.S.C. § 515
D.C. Bar No. 90042268
Samuel.Deau@usdoj.gov

601 D Street NW
Washington, DC 20579
(202) 252-7566