**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **25-CR-335-FWV** |
| **MARQUIS COPEZ** | : | |

**DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF GOVERNMENT'S PROFFERED FINGERPRINT EXPERT AND REQUEST FOR DAUBERT HEARING**

Marquis Copez, through undersigned counsel, respectfully moves this Honorable Court to exclude the testimony of Lisa McAvoy, who the Government intends to call as an expert witness in the field of latent fingerprint analysis in this case. The proposed testimony is inadmissible under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) because 1) it is not the product of reliable principle and methods, and 2) the government has not demonstrated that its proffered expert applied the principles and methods reliably to the facts of the case. Counsel requests a hearing on this Motion.

**BACKGROUND**

Mr. Copez is charged with four counts of threatening to murder a federal judge with intent to interfere while engaged in the performance of official duties, in violation of 18 U.S.C. § 115(a)(1)(B) and four counts of mailing threatening communications, in violation of 18 U.S.C. § 876(c). On January 16, 2026, the government filed an expert notice of its intent to call Lindsay McAvoy as an expert witness in the field of latent fingerprint analysis at trial. According to the Notice, the government intends to elicit testimony from Ms. McAvoy to provide information on latent fingerprint processing and analysis, including her application of those methods to the evidence of this case. Ms. McAvoy is expected to testify that she identified one latent print recovered from a letter sent to Judge Ellen Hollander as originating from Mr. Copez. She will also

testify that other latent prints were identified to other individuals, excluded to certain individuals, or deemed inconclusive. Fingerprint examiners, like Ms. McAvoy, often use a method of latent fingerprint analysis referred to as "ACE-V," which stands for analysis, comparison, evaluation, and verification. In performing the ACE-V methodology, an examiner typically analyzes a "latent print" recovered from a piece of evidence and compares it to a "known print." The examiner then evaluates the two prints, determining whether a conclusion can be made that the latent and known print originated from the same source.

**ARGUMENT**

To be admissible under Federal Rules of Evidence 702, the proponent of expert testimony must establish that: 1) "the testimony is the product of reliable principles and methods" and 2) "the expert's opinion reflects the reliable application of the principles and methods to the facts of the case." Fed. R. of Evid. 702(c)-(d). In *Daubert*, the Supreme Court charged federal trial judges with a critical "gatekeeping" role of ensuring that any and all expert testimony admitted under Rule 702 rests on a reliable foundation. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993) ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence is not only relevant, but reliable."); s*ee also Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017) ("Rule 702 imposes a special gatekeeping obligation on the trial judge to ensure that an opinion offered by an expert is reliable"); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) ( "[R]eliability and relevancy . . . are preconditions to the admissibility of expert testimony."). Though district courts have broad discretion in analyzing the reliability of expert testimony, "such discretion does not include the decision to abandon the gatekeeping function." *Sardis*, 10 F.4th at 282 (quoting *Nease*, 848 F.3d at 230) (internal quotations omitted). This requirement recognizes the powerful and potentially misleading quality of expert testimony. *See*

*Daubert*, 509 U.S. at 595. *See also Cooper v. Smith & Nephew, Inc*. 259 F.3d 194, 199 (4th Cir. 2001).

Under *Daubert*, the court balances five factors in assessing the reliability of expert testimony: 1) whether the expert's theory or technique has been tested; 2) whether the theory has been subject to peer review or publication; 3) whether the technique has a known or potential rate of error; 4) whether there are standards controlling the technique's operation; and 5) whether the theory has been generally accepted within the relevant scientific community. *See Daubert*, 509 U.S. at 592-94. *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999) (extending *Daubert's* holding on scientific expert testimony to all expert testimony). This list is not exhaustive, and the court can consider any factor that bears on reliability. *See Daubert*, 509 U.S. at 593. *See also Sardis*, 10 F.4th at 281. Ultimately, the inquiry to be undertaken by the district court is a "flexible one" focused on the principles and methodology employed by the expert, not on the conclusions reached. *See Jones v. Allen*, No. PX-15-1173, 2016 WL 9443772, at *2-3 (D. Md. Oct. 24, 2016) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)) (quotations omitted).

Here, the principal consideration is whether the latent fingerprint analysis the government intends to present in its case is sufficiently reliable for presentation through expert testimony, pursuant to *Daubert* and Rule 702. The government carries the burden of proving this prerequisite of admissibility is met. *See Higginbotham v. KCS Int'l*, 85 F. App'x 911, 915 (4th Cir. 2004) (citing *Daubert*, 509 U.S. at 592 n.10). The government plainly cannot meet that burden. The government has not demonstrated that the ACE-V method of latent fingerprint analysis is scientifically valid or that it was appropriately applied in this case. Given these deficiencies, Mr. Copez is entitled to a *Daubert* hearing. *See Sardis*, 10 F.4th at 282 (noting that when a party challenges an opposing

party's expert testimony as unreliable, "the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline'") (quoting *Kumho Tire*, 526 U.S. at 149). At the conclusion of that hearing, Counsel respectfully asks the court to apply the principles of *Daubert* and Rule 702 of the Federal Rules of Evidence and exclude or, at a minimum, limit the testimony of the government's proffered fingerprint expert.

## I. Changing Legal Landscape.

Over two decades ago, the Fourth Circuit held that the district court did not abuse its discretion in admitting expert testimony on fingerprint identification. *See United States v. Crisp*, 324 F.3d 261, 269 (4th Cir. 2003). The court concluded that the district court acted within its discretion in accepting expert and judicial "consensus" regarding the reliability of this evolving discipline of forensic science. *Id*. In its own application of *Daubert*, the court similarly entrusted prevailing notions about fingerprint identification's reliability within the scientific community and across federal jurisdictions. *Id*. In the years since the *Crisp* decision, however, the scientific community has expressed mounting concern over the reliability of latent fingerprint analysis.

Criticism of latent fingerprint analysis gained momentum after the National Academy of Sciences issued a report in 2009 weakened scientific confidence in the reliability of fingerprint analysis. *See generally* Strengthening Forensic Science in the United States: A Path Forward, National Research Council, National Academy of Sciences (Feb. 2009) (hereinafter the "NAS Report"). Congress mandated the National Academy of Sciences to issue this report after the highly publicized misidentification of Brandon Mayfield's fingerprints in connection with a 2004 bombing in Madrid, Spain—after a latent fingerprint analysis expert identified the latent print "belonging" to Mayfield. *See Mayfield v. United States*, 599 F.3d 964 (9th Cir. 2010). NAS conducted an exhaustive and unprecedented examination into the available scientific evidence on

the validity of the ACE-V method of latent fingerprint analysis and recognized an "unambiguous" conclusion: the ACE-V method lacks scientific validity. *Id* at 143. More recently, in 2016, the President's Council of Advisors on Science and Technology issued a report evaluating various forensic disciplines and practices. *See* President's Council of Advisors on Sci. and Tech., Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (Sept. 2016) (hereinafter "PCAST Report"). The PCAST report scrutinized the reliability of latent fingerprint analysis and concluded: "Developments over the past two decades … have called increasing attention to the question of the validity and reliability of some important forms of forensic evidence," including latent fingerprint analysis, "and of testimony based on them." *Id.* at 1.

While it is true that testimony regarding latent fingerprint analysis has been accepted by federal courts in the past, the rationale underlying the seminal cases admitting fingerprint evidence—like *Crisp* in the Fourth Circuit—has been called into question by recent developments in this evolving discipline of forensic science. Moreover, Rule 702 was amended in two important ways on December 1, 2023 that recasts previous legal analysis under Rule 702 on the admissibility of expert testimony regarding latent fingerprint examination. The advisory committee noted that historically, courts have "failed" to correctly apply the reliability requirements of Rule 702. *See* House Committee on the Judiciary, Amendments to the Federal Rules of Evidence, H. Doc 118-33 at 19. Thus, the committee added a preponderance of the evidence standard to ensure that expert testimony is not admitted unless the court determined that it is "more likely than not that the proffered testimony meets the admissibility requirements." These amendments were specifically designed to ensure that the concerns like those Mr. Copez raises are appropriately considered in deciding the *admissibility* of the proffered testimony, not punting them to the jury to determine its

*weight*. The findings of the NAS and PCAST reports, together with the recent amendments to Rule 702, make clear the need for renewed judicial scrutiny of the admissibility of latent fingerprint analysis under *Daubert* and Rule 702.

**II. ACE-V fails Daubert.**

Testimony about latent fingerprint analysis, like all expert testimony, is only admissible if it is based on reliable principles and methods that can be properly applied to the facts in issue in a particular case. *See Daubert*, 509 U.S. at 593; *Kumho Tire*, 526 U.S. at 141; Fed. R. Evid. 702. Regardless of the scientific validity of a method in the abstract, an expert cannot give an opinion based on a slipshod application of that method. Here, the government seeks to elicit testimony from its proffered fingerprint expert without providing a sufficient evidentiary basis to demonstrate that its expert relied on valid methods or that those methods, even if valid, were appropriately applied to the facts of this case.

The method of latent fingerprint analysis the government's fingerprint expert used in this case lacks objective standards and weighs against admissibility under *Daubert*. In *Crisp*, the Fourth Circuit found that the district court did not abuse its discretion in concluding that professional standards adequately controlled latent fingerprint identification under *Daubert*. *See Crisp*, 324 F.3d at 269. The Court relied on the expert's testimony that, although the degree of correlation required for positive identification varied among examiners, fingerprint analysts applied a consistent "points and characteristics" approach, thereby promoting reliability within the field. *Id.* The subsequent NAS and PCAST Reports, however, substantially undermined the basis for concluding that these practices provide standards sufficient to satisfy *Daubert*.

The NAS and PCAST Reports revealed latent fingerprint analysis lack uniform, objective standards controlling the fingerprint examination process. The NAS Report found that latent

fingerprint analysis using the ACE-V method, applied by the fingerprint expert in this case, provides only a "broadly stated framework" and "does not specify particular measurements or a standard test protocol." NAS Report at 139, 142. Instead, an examiner's subjective assessment imbues every stage of the ACE process, especially when applied to latent fingerprints. *Id.* at 139 ("When dealing with a single latent print…the interpretation task becomes more challenging and relies more on the judgment of the examiner."). Most troubling, in the comparison stage of ACE, there is no threshold for the quantity and quality of comparable details for a fingerprint analyst to make an identification. *Id.* The NAS Report found that defining objective measurement criteria for fingerprint identification would improve the reliability of the ACE process—but opined that such criteria is inherently difficult given its "intrinsic subjectivity" and variability in the clarity of the fingerprints to which it is applied. *Id.* at 139-140 (noting that "those criteria become increasingly more important when working with latent fingerprints that are smudged and incomplete"). Absent controlling standards to curtail subjectivity, fingerprint examiners applying the ACE-V methodology may arrive at differing outcomes regarding the same fingerprint. *Id.* at 139. The NAS Report ultimately concluded that the ACE process "is not specific enough to qualify as a validated method," "is too broad to ensure repeatability and transparency," "does not guard against bias," and "does not guarantee that two analysts following it will obtain the same results." *Id.* at 142.

The PCAST Report later confirmed that the ACE-V method of latent fingerprint analysis still lacked the requisite "controlling standards" required by *Daubert*. The PSCAT concluded that "latent fingerprint analysis is a foundationally subjective study" and urged "convert[ing] latent-print analysis from a subjective method to an objective method." PCAST Report at 9-10. Though PCAST found latent fingerprint analysis to be methodologically valid in theory, in application, the

report noted multiple concerns, including the "serious risk" of confirmation bias within fingerprint examiners. *See* PCAST Report at 102. PCAST concluded that proficiency testing of fingerprint examiners is necessary but currently inadequate. *Id.* PCAST recommended that proficiency testing be improved to become more rigorous, systematically integrated into casework, and disclosed for evaluation by the scientific community. *Id.* Together, the NAS and PCAST Reports cast doubt on *Crisp's* premise that the "points and characteristics" approach to and proficiency testing supply sufficient controlling standards to ensure consistency among fingerprint analyses. *See Daubert*, 509 U.S. at 269.

Given the ACE-V method's lack of objective guardrails and its reliance on a fingerprint examiner's subjective assessments, this *Daubert* factor weighs against admissibility of testimony on latent fingerprint analysis. *See United States v. Mitchell,* 365 F.3d at 215, 241 (3d Cir. 2004) (finding that the ACE-V method "lacks a significant yardstick of standard-based objectivity" and that this *Daubert* factor did not favor admission). In *United States v. Wright*, the U.S. District Court for the Eastern District of Pennsylvania recently found that *Daubert*'s standards and controls factor weighed against the admissibility of expert testimony based on the ACE-V method. *See United States v. Wright*, No. 19–230, 2022 WL 3928391 (E.D. Pa. Aug. 31, 2022) (adopting the Third Circuit analysis in *Mitchell* regarding this *Daubert* factor). In its reasoning, the court explicitly made note of the NAS Report, "which calls for heightened standards in the field of fingerprint evidence . . . and advises that '[n]o single protocol has been officially accepted by the profession' for the ACE-V method." *See Wright*, 2022 WL 3928391, at *9 (citing NAS Report at 143).

The discovery provided by the government has not demonstrated to the court by the preponderance of the evidence that the testimony it intends to elicit "is the product of reliable principles and methods," pursuant to Rule 702. Nor has the government provided critical

information assessing the reliability of the fingerprint expert's testimony under other factors given importance in *Daubert*. Namely, the government has not provided the error rate for latent fingerprint identification; confirmed whether the ACE-V methodology has been subjected to peer review and publication; or enjoyed general acceptance within the relevant scientific community in the aftermath of the NAS and PCAST Reports. This information calls into question the reliability and, accordingly, the admissibility of the fingerprint expert's proposed testimony in this case. Therefore, the Court should hold a Daubert hearing. Since the government has not demonstrated the reliability of the ACE-V method of latent fingerprint examination, the Court should exclude this testimony pursuant to Rule 702 and *Daubert*.

## III. The Government Has Not Demonstrated that its Proposed Fingerprint Expert Reliably Applied the ACE-V Method of Latent Fingerprint Analysis to the Evidence in this Case.

Even if the Court finds that the principles and methods latent fingerprint analysis are sufficiently reliable under Rule 702(c) and *Daubert*, the Court should still exclude Ms. McAvoy's testimony because she did not reliably apply its principles and methods to the facts of this case pursuant to Rule 702(d). The advisory note to the 2023 amendments to Rule 702 clearly states that "[e]xpert opinion testimony regarding the weight of feature comparison evidence (i.e., evidence that a set of features corresponds between two examined items) must be limited to those inferences that can reasonably be drawn from a reliable application of the principles and methods." Fed. R. Evid. Advisory Committee's Note to 2023 Amendment.

The government has produced limited notes regarding what Ms. McAvoy and Danielle Merritt, the examiner who "verified" Ms. McAvoy's work, did in this case. Notably, this discovery does not sufficiently document *how* Ms. McAvoy reached the conclusions of her fingerprint examination. Even still, Ms. McAvoy's report and accompanying case notes reveal her unreliable

application of the ACE-V across all stages of its processes—and, as a result, her expected testimony would be grounded in unreasonable inferences that would mislead a jury. Accordingly, the Court should exclude Ms. McAvoy's testimony.

a. Introduction

The government's Expert Notice sets out that Ms. McAvoy intends to testify to "how she received, processed, and conducted examinations on the evidence submitted to her in this case . . . in accordance with the U.S. Secret Service Forensic Services Division's Quality Assurance Manual, Laboratory Operations Manual, and Latent Print Standard Operating Procedure Manual in effect at the time." According to the U.S. Secret Service Forensic Services Division Laboratory Operations Manual, as a staff member, Ms. McAvoy was expected to use only the methods and procedures of latent fingerprint analysis outlined in these manuals, which outlined the specific operating procedures for all processes "having a direct impact on the quality of laboratory results." *See* Ex. 5, Laboratory Operations Manual at 78. Ms. McAvoy was also bound by the Forensic Services Division's Quality Assurance Manual. *See* Ex. 6, QD Standard Operating Procedures at 5. Together, these manuals outline the specific operating procedures Ms. McAvoy was expected to follow in conducting latent fingerprint analysis.

Ms. McAvoy's Report and its accompanying case notes, however, do not establish that she faithfully adhered to the specific operating procedures approved by the U.S. Secret Service's Forensic Services Division. According to the Quality Assurance Manual, all laboratory personnel were required to "accurately, clearly, unambiguously, and objectively report the results of each examination" in reports that "include information regarding the examination conducted and any information necessary for the interpretation of the examination results." *See* Ex.7, Quality Assurance Manual at 40. A report's case notes are the primary documentation of the procedures,

observations, and results of the tests performed by a fingerprint specialist used to support the examiner's conclusions. *See* Ex. 7, Quality Assurance Manual at 6. Case notes must detail an examiner's processing, examination, and analysis to support conclusions in a clear and accurate manner. *See* Ex. 5, Laboratory Operations Manual at 24. These conclusions are limited to those that logically flow from the underlying data and analytical results. *Id.* at 26.

As this Court recognizes, when "admissibility of the examiner's opinion as to the existence of a match is predicted on the examiner's experience, it is essential that the examiner provide a sufficient explanation for the basis of the opinion." *See U.S. v. Wilock*, 696 F. Supp. 2d 536, 561 (D. Md. 2010). The Forensic Services Division recognized the importance of documenting subjective opinions and clearly states that, when an examiner includes an opinion or interpretation in a report, "[t]he examiner will document that basis for his/her opinions and/or interpretations in the examination documentation." Ex. 7, Quality Assurance Manual at 42. Ms. McAvoy's Export Report and its accompanying case notes, however, do not adequately document how Ms. McAvoy reached important, subjective conclusions of her latent fingerprint examination throughout the ACE-V process. Accordingly, Ms. McAvoy did not reliably apply the ACE-V method of latent fingerprint examination outlined by these procedures to the evidence in this case. Ms. McAvoy failed to reliably apply the principles and methods of ACE-V throughout each stage of the analysis, comparison, evaluation, and verification process.

a. <u>Analysis</u>

At the analysis stage of her latent fingerprint examination, McAvoy's case notes do not adequately detail how she concluded certain latent fingerprints were "suitable" or "not suitable" to proceed with comparison. Analysis is an examiner's subjective assessment of a latent print to determine its "suitability" for comparison. *See* Ex. 8, LP Standard Operating Procedure at 13-14.

Latent prints deemed "not suitable" for comparison are not analyzed further. *Id*. A latent print is "suitable for comparison" only if "[t]he friction ridge detail contains sufficient quality (clarity) and quantity (amount of features) of friction ridge features with an acceptable tolerance for specificity, variation in appearance and location." *Id.* at 14. The Forensic Services Division Laboratory's procedures specify that latent fingerprints must have at least two levels of friction ridge detail to be deemed "suitable," therefore providing a benchmark for "quantity" measure of this two-part determination. *Id.* The "clarity" measure, in contrast, is a discretionary determination of the examiner. Since the "clarity" measure is the subjective opinion of the examiner, according to standard operation procedure, its bases must be included in the case notes. *See* Quality Assurance Manual at 42.

Despite this requirement, the "notes" field accompanying Ms. McAvoy's suitability determinations were frequently left blank and lack any explanatory support. *See* Ex. 3, Disclosures, Exhibit C at 7. Even more troubling, however, is the lack of explanation for Ms. McAvoy's suitability determinations for latent prints she explicitly noted as unclear. Notably, for latent print #9L8—later "identified" to Mr. Copez—Ms. McAvoy noted the "area near and above delta is unclear" and that "[d]iagonal lines coming from the left towards the core partially obscure features and reduce confidence in that area." *See id.* And yet, Ms. Copez deemed this latent print "suitable" without providing any explanation to bridge the analytical gap between the lack of clarity of this print and her subjective suitability determination. *See id.*

b. <u>Comparison</u>

At the comparison stage, Ms. McAvoy's case notes show significant procedural missteps that conclusively reveal her unreliable application of the ACE-V method to the evidence in this case. If a latent print is deemed "suitable" for comparison, its friction ridge details are compared

side-by-side to the known print "to determine whether the information in the two prints are in agreement or disagreement based upon similarity, sequence, and special relationship" *See* Ex. 8, LP Standard Operating Procedure at 16. Ordinarily, prior to conducting this comparison, an examiner may opt to search certain Automated Biometric Identification Systems ("ABIS") databases, including the Automated Fingerprint Identification Systems ("AFIS"). *Id.* Examiners can upload a latent print to these systems, which will search its repository of known records and return a list of potential matching candidates. *Id.* at 22. Examiners then proceed with comparison if a subject was not identified. *Id.* at 14. The procedure for threat cases, however, is notably different: "[f]or threat cases . . . all comparisons shall be conducted" in addition to an utilizing an ABIS database search. *Id.* at 14, 23. Ms. McAvoy did not reliably apply this specifically outlined procedure in this case. Ms. McAvoy's case notes indicate that she did not conduct an ABIS/AFIS search for many of the latent prints deemed suitable for comparison recovered from letter with sender name Simon. *Id.* at 10.

c. <u>Evaluation</u>

Further, Ms. McAvoy did not provide *any* explanation explaining the results of her comparison for any latent print recovered in this case. *See* Ex. 3, Disclosures, Exhibit C at 9-10. At the end of her comparison, Ms. McAvoy made the determination that a subset of the latent prints she analyzed could be "identified" or "excluded" from particular individuals. *Id.* at 2. She provided a brief remark regarding what, exactly, this determination means. An identification is the examiner's determination that "there is sufficient quality and quantity of detail in agreement to conclude that two friction ridge prints originated from the same source." *Id.* An exclusion is the examiner's determination "there is sufficient quality and quantity of detail in agreement to conclude that two friction ridge prints *did not* originate from the same source." *Id.* (emphasis

added). Since such determinations are inherently subjective opinion of degree not kind, Ms. McAvoy was required to "document the basis for [her] opinions and/or interpretations in the examination documentation." Ex. 7, Quality Assurance Manual at 41. Ms. McAvoy did not adhere to this procedure. Instead, Ms. McAvoy simply announced her conclusions in her report. *See* Ex. 2, Disclosures, Report at 2.

The case notes supplementing Ms. McAvoy's report do not ameliorate this deficiency. In her case notes, Ms. McAvoy did not provide any qualitative explanation to document the "quality . . . of detail in agreement" between the latent and known prints to support her conclusions. *See* Ex. 3, Disclosures, Exhibit C at 2. Notably, Ms. McAvoy entirely neglected to fill in the "description / notes" field in the comparison table included within her case notes. *Id.* at 9-10. Ms. McAvoy also failed to adequately explain the "quantity . . . of detail in agreement" between the latent and known prints to support her conclusions. The images provided in the case notes are not instructive on this issue. Although Ms. McAvoy's case notes include images of the latent prints she analyzed with multi-colored "dots" overlayed—which indicate different levels of confidence regarding the presence of certain features an examiner observes on a latent or known fingerprint—examiners apply these "dots" to images at both the analysis and comparison stage of ACE-V. *See* Ex. 8, LP Standard Operating Procedure at 15. The multi-stage application of these "dots" makes it impossible to determine when in the ACE-V process Ms. McAvoy observed a particular feature, raising issues of confirmation bias. *Id.* Taken together, Ms. McAvoy's report and accompany case notes are insufficient to explain the qualitative and quantitative support for Ms. McAvoy's subjective conclusions as required by standard operating procedure. Ms. McAvoy therefore did not reliably apply this procedural requirement of the ACE-V method to the evidence in this case.

d. Verification

To comply with the methodology of ACE-V, after one examiner reaches her conclusions about a latent fingerprint, a second examiner must independently analyze, compare, and evaluate the latent print to form their own conclusions. Ex. 8, LP Standard Operating Procedure at 19. Through this process, the second examiner verifies the conclusions of the first examiner regarding a latent fingerprint, whether those conclusions resulted in one or multiple identification, exclusion, or inconclusive determinations. *Id.* Based on the discovery provided by the government in this case, an individual named Danielle Merritt appears to have been responsible for verifying the conclusions of Ms. McAvoy. *See generally* Ex. 3, Disclosures, Exhibit C, at 12-14 (including notations by Danielle Merritt); *see also* Ex. 4, Disclosures, Exhibit D, at 65 (designating Danielle Merritt as the "technical reviewer" assigned to case number associated with Ms. McAvoy's latent fingerprint analysis in this case). According to the Forensic Services Division's Quality Assurance Manual, all "technical reviewers" like Merritt must be "qualified in a specific discipline that is authorized to conduct a technical review in that discipline or test method." *See* Ex. 7, Quality Assurance Manual at 13. Counsel is not aware of any information the government has provided in discovery detailing the role of Ms. Merritt—much less her qualifications in the subjective discipline of latent fingerprint analysis. This alone casts doubt on the validity of the verification process in this case. If Ms. Merritt is not "qualified" to technically review and apply the ACE-V methodology, for example, the critical verification process for Ms. McAvoy's conclusions was over before it began.

Assuming arguendo that Ms. Merritt is qualified to perform the technical review in this case, this review was fundamentally flawed. Ms. Merritt went through the motions of analyzing, comparing, and evaluating the 10 of the 11 latent prints Ms. McAvoy found suitable in her initial examination. *See* Ex. 3, Disclosures, Exhibit C, at 12-14. It is not clear why Ms. Merritt failed to

verify latent print #28L5. At the analysis stage of this verification process, Ms. Merritt's documentation frequently differed in significant respects from Ms. McAvoy's examination and is even more sparse in detail. *See generally* Ex. 3, Disclosures, Exhibit C, at 12 (logging the "anatomical aspect" analyzed simply as "fingerprint" without further type characteristics on all but one occasion). For two of the 10 latent prints, Ms. Merritt found only two levels of friction ridge detail in her analysis, whereas Ms. McAvoy had proceeded as if there were three levels of friction ridge detail could reliably be analyzed for several more. *See id.* Furthermore, Ms. Merritt either did not notice the distortions present on various of the latent fingerprints, including that the latent print identified to Mr. Copez was distorted and unclear. *Compare* Ex. 3, *id.* at 7, *with id.* at 12 (indicated "no distortion" on latent print #9L8, whereas Ms. McAvoy noted "distortion due to movement."). For nine of the 10 latent prints, Ms. Merritt included no explanation in the "notes" field of her analysis chart. *See id.* at 12. Yet she deemed all 10 latent prints suitable to proceed with comparison. *See id.* Ms. Merritt therefore provided no qualitative support for her opinion that all 10 latent prints contained "sufficient quality (clarity) and quantity (amount of features) of friction ridge details with an acceptable tolerance of specificity, variation in appearance and location such that the print could move forward with comparison." *See* LP Standard Operating Procedure at 14. Without documenting *how* she deemed all 10 latent prints suitable, Ms. Merritt nonetheless proceeded with comparison. At the comparison stage, Ms. Merritt did not document anything whatsoever. The "description / notes" section of Ms. Merritt's comparison chart was simply left blank for all 10 latent prints. *See* Ex. 3, Disclosures, Exhibit C, at 13.

At the evaluation stage, Ms. Merritt at times either failed to verify or reached a different conclusion from Ms. McAvoy. More specifically, Ms. McAvoy excluded latent fingerprint #28L4 and #285 to Dominick Simon based on "individual characteristics." *See* Disclosures, Exhibit C, at

10. Ms. Merritt's comparison results for latent fingerprint #28L4 does not verify this exclusion—or make any mention of the exclusion or Dominick Simon whatsoever. *See* Ex. 3, Disclosures, Exhibit C, at 14. Danielle Merritt also did not verify the exclusion of Dominick Simon for latent fingerprint #28L5, as she did not verify any of the conclusions Ms. McAvoy reached regarding this latent fingerprint for unknown reasons. The Forensic Sciences Division's Standard Operating Procedure states the following procedure: "[t]he original and verifying examiner shall discuss the basis for their conclusion when a difference of opinion occurs. If consensus is not reached, the conflict resolution policy as stated in the [Laboratory Operations Manual] shall be used." *See* Ex.8, LP Standard Operating Procedures at 19. Their differing comparison results make clear that Danielle Merritt and Ms. McAvoy did not reach "consensus" on the exclusion of Dominick Simon for latent fingerprint #28L4. *Compare* Ex. 3, Disclosures, Exhibit C, at 7, *with id.* at 14. It is also clear that the two examiners did not conform to the Laboratory Operation Manual's conflict resolution, which requires additional documentation of additional, independent examination not present in the discovery file. *See* Ex. 5, Laboratory Operations Manual at 79-82.

Notwithstanding the significant flaws in their verification process, Ms. McAvoy reported her conclusions in her expert report. *See* Ex. 2, Expert Report at 1-2. Among them, Ms. McAvoy reported latent fingerprint #28L4 had been excluded to Dominick Simon despite lack of verification. Ms. McAvoy even reported her conclusions on latent fingerprint #28L5—a fingerprint that Ms. Merritt did not analyze, compare, evaluate, or verify. Accordingly, the conclusions of Ms. McAvoy's report on which the government intends to elicit testimony lacks verification, which flies in the face of a fundamental principle of the ACE-V method of latent fingerprint examination.

e. <u>Exclude</u>

Ms. McAvoy's Expert Report and accompanying case notes, or lack thereof, do not demonstrate that she reliably applied the principles and methodologies of ACE-V latent fingerprint examination. In fact, the materials provided by the government in this case demonstrate the opposite conclusion. In *State v. Koiyan*, 841 S.E.2d 351 (N.C. Ct. App. 2020), the Court of Appeals of North Carolina found that the trial court erred by admitting expert testimony of a latent fingerprint examiner who failed to provide detail of *how* he arrived at his conclusion that the latent fingerprints matched the defendant. The court reasoned that, although the expert provided cursory details about his methodology, including that he examines "three levels of details" on each print, looking at the "ridges and bifurcations and their spatial relationship,'" the expert did not explain what specific characteristics of the latent print matched the defendant. *See Koiyan*, 841 S.E.2d at 355 ("While [the expert] testified earlier that he generally examines prints for 'three levels of detail' and looks for 'ridges and bifurcations and their spatial relationship" on each print, [the fingerprint expert] failed to provide any such detail when testifying as to *how* he arrived at his conclusions *in this case*.") (emphasis in original). The Court of Appeals of North Carolina, citing these deficiencies, found that the fingerprint expert's testimony was insufficient to demonstrate his reliable application of accepted methods and procedures to the facts of the case, pursuant to Rule 702. *Id.*; *see also United States v. Watkins*, 880 F.3d 1221, 1227 (11th Cir. 2019) (finding that a fingerprint analyst's expert testimony was probably not reliable since the expert did not testify to her scientific methods and questioning whether the expert's testimony was based on sufficient facts or data).

Ms. McAvoy similarly failed to explain how she arrived at her conclusions in this case. Like the fingerprint expert in *Koiyan*, in this case, Ms. McAvoy's Expert Report and accompanying documentation do not specify which characteristics of each latent and known prints

Ms. McAvoy specifically relied upon when arriving at her conclusions. This documentation does not explain which characteristics formed the basis of her suitability determinations at the analysis stage, were located at the comparison stage, or ultimately supported her identification, exclusion, and inconclusive conclusions. Absent this support for her conclusions, Ms. McAvoy's Expert Report and case notes are insufficient to demonstrate that she reliably applied the principles of the ACE-V methodology to the evidence in this case.

The Seventh Circuit in *United States v. Saunders*, 826 F.3d 363 (7th Cir. 2016), held that the lower court erred in admitting expert testimony when the government failed to provide documentation on the "number of points of identification" the fingerprint expert relied upon to make identifications. *Id.* at 369. In that case, the fingerprint expert used the ACE-V method to conclude that latent fingerprints found on evidence matched the defendant. *Id.* The court explained that "the ACE–V method boils down to recognizing and categorizing distinctive features in prints and it is the *distinctiveness of these features*, rather than the ACE–V method itself, that enables fingerprint examiners to match fingerprints." (internal quotation omitted) (emphasis in original). Since the points of comparison formed the very basis of the fingerprint expert's conclusions, the court found that the government erred by failing to disclose the number of points and characteristics the expert relied upon in forming his opinion under Rule 16. *Id.* The court noted that the points and characteristics "being such a crucial, yet subjective, variable in the [ACE-V] process arguably makes the number of points and what those points are even more important." *Id.*

Those disclosures have not been clearly made here, either. Indeed, defense counsel appears to be missing substantial portions of a standard case file for fingerprinting experts, including datafiles that reflect the latent prints in standard (.eft or .wsq) format, encoding records indicating the ridge details (or "minutiae") marked by laboratory personnel, and clear documentation

reflecting any enhancements made. Most critically, as in *Sauders*, the government has failed to clearly disclose the number of points of comparison and the quality of those points in its expert disclosures. It has provided a comparison page on 38 of the expert notes, that includes several dots in varying colors. But without additional explanation, it is impossible to tell from those disclosures whether those dots were placed at the analysis or comparison phase of ACE-V or exactly what those dots indicate. And without the multilayered data files defense counsel is missing, it is impossible to adequately review and analyze the expert's work. Absent additional disclosure, exclusion is warranted under *Koiyan*, *Saunders*, *Daubert*, Rule 16, and Rule 702.

## CONCLUSION

For the foregoing reasons, this Honorable Court should conduct an evidentiary hearing to consider whether the government can sustain its burden under *Daubert* and should ultimately exclude the testimony of the government's proffered fingerprint expert.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER
/s/
TEZIRA ABE
COURTNEY L. MILLIAN
Assistant Federal Public Defender
625 Indiana Ave. N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500